**STATE ex rel. BABB, Co. Atty., v. MATHEWS et al.**

No. 19998. Opinion Filed Dec. 21, 1928.

Rehearing Denied Jan. 12, 1929.

Dissenting Opinion, Jan. 2, 1929.

James Babb, Co. Atty., Grady Lewis, and Freeling & Box, for plaintiff.

Edwin Dabney, Atty. Gen., and V. P. Crowe, Asst. Atty. Gen., for defendants.

HARRISON, J. This is an original proceeding in this court for a writ of prohibition to the State Court of Tax Review, the real object of the proceedings being to test the constitutionality of Initiative Petition No. 100, State Question No. 152, adopted at the state primary election held August 7, 1928, under which measure the State Court of Tax Review was created and its powers and jurisdiction defined. The constitutionality of the act is challenged and application made for a writ prohibiting said Court of Tax Review from exercising any jurisdiction under the provisions of said act.

Due to the public importance of the question, this court has consented to exercise original jurisdiction. The measure or act in question is as follows:

"An Act providing a method of contesting alleged illegal ad valorem tax levies; requiring copies of all appropriations and levies to be filed with the county clerk and State Auditor; fixing the time and method of filing protests; creating a Court of Tax Review, conferring jurisdiction thereon, prescribing procedure therefor, making the State Auditor clerk of said court, providing a method of appeal therefrom to the Supreme Court; providing for correction of appropriations, levies and tax rolls; providing for refund of illegal taxes that may be collected, limiting the contracting of debts and issuing of warrants pending determination of legality of tax levies and repealing all acts and parts of acts in conflict herewith.

"Be It Enacted by the People of the State of Oklahoma:

"Section 1. After the officers of the several municipal subdivisions of the state, constituting the budget-making bodies of such subdivisions, including counties, cities, towns, school districts and townships, shall have made and filed their budgets as required by existing laws with the county clerks, and after advertisement as now required by law, the excise boards shall meet on the last Saturday in July, and from time to time thereafter until the State Board of Equalization shall have reported the valuation of public service corporations and utilities, together with the equalized valuation of all other property, to the county, and shall then proceed to pass on appropriations and make levies for all such municipal subdivisions as now provided by law, and shall file a copy of all budgets with the levies made thereon, with the State Auditor, and one copy with the county clerks of the respective counties, and the county clerk shall immediately thereafter publish notice for one time, in some newspaper of general circulation in the county, that such budgets and levies are on file for the inspection of any citizen.

"Within three days after the filing of any such budgets and levies with the State Auditor he shall give notice by mail of the fact and date of such filing with him to any taxpayer who shall have filed written request therefor.

"Section 2. Taxpayers of the state shall have the right at all times to examine the budgets and levies on file with the respective county clerks of the state and with the

State Auditor, for the purpose of checking same for illegalities in the levies made, and any taxpayer may, at any time within 40 days from the date of filing with the State Auditor as above provided for, file a protest in writing together with three copies thereof, with the State Auditor against any alleged illegality of any levy and the State Auditor shall thereupon transmit by registered mail one copy of each to the county clerk, the county attorney and county treasurer of the county affected thereby, or said protest with the same number of copies may be filed with the county clerk, in which event the county clerk shall transmit one copy of each to the State Auditor and to the county attorney and county treasurer of the county affected thereby, and such filing shall have the same force and effect as though filed with the State Auditor. The said protest shall specify the said alleged illegal levy and the grounds upon which said alleged illegalities are based. Any protest filed by any taxpayer as herein provided shall inure to the benefit of all taxpayers. If no protest is filed by any taxpayer as to the levy of any county or municipal subdivision thereof within said 40 day period, all appropriations and levies of said county and municipal subdivisions thereof not protested, shall be deemed to be legal, and all proceedings for refunds or suits for refunds or recovery of taxes or to contest the validity thereof in any manner shall be barred.

"The excise board may reconvene at any time within 60 days after the filing of the budgets and levies with the State Auditor and reduce any protested budgets and levies which the excise board deems to be illegal.

"Section 3. There is hereby created a Court of Tax Review, which shall consist of three district judges, who shall be designated by the Governor. The court shall meet at the State Capitol on the first Monday in October of each year and proceed to hear all protests which shall have been filed for at least five days prior thereto, and shall reconvene on the first Monday of each month thereafter until all protests have been heard and determined by it. The said judges shall be paid their traveling and living expenses while acting as members of said court, out of the funds now provided by law for payment of district judges' expenses when holding court outside the counties of their residence. The State Auditor shall act as clerk of said court.

"Section 4. Said court shall have the power and it shall be its duty to hear and determine all protests filed under this act, and it shall have the power to administer oaths, compel the attendance of witnesses and production of evidence, including any public record from any county in the state upon the hearing of such protest. Said court shall proceed to hear and determine all said protests as speedily as practicable, and,

so far as practicable, shall hear all protests for any county on the same date, providing that continuances may be granted as to any protestant or any county upon good cause shown.

"Section 5. A majority of said court shall hear and determine all protests submitted to it and its decision shall be in writing and filed with the State Auditor, whose duty it shall be, if no appeal be taken as hereinafter provided, to transmit a copy of such decision to the county clerk, county assessor, and county treasurer, and to the protestant or his attorney of record, and it shall thereupon be the duty of the county clerk to correct the appropriations accordingly, and the duty of the county assessor to so correct the tax rolls if the same have not been turned over to the county treasurer. The county attorney, assisted by the Attorney General, shall represent his county and the municipal subdivisions thereof at the hearing of any protest before said Court of Tax Review, and each county shall pay all necessary expenses of its county attorney in attending any such hearings. No pleadings by the county shall be required and the cause shall be deemed at issue upon the filing of such protest.

"Section 6. Either the protestant or the county may appeal from the final decision of the court to the Supreme Court of the state, and it shall be sufficient to perfect such appeal if the appellant shall, within ten days after the filing of such decision of the court with the State Auditor, cause to be filed with the State Auditor a statement in writing that appellant does appeal. If no appeal be taken, the decision of the court shall be final.

"Section 7. The court shall cause the evidence adduced at any time and all hearings to be taken and preserved, and upon an appeal being taken in any case to the Supreme Court, a transcript consisting of the protest, the evidence adduced at the hearing, the decision of the court and the statement of appeal, shall, as soon as possible after the filing of such statement of appeal, be filed by the State Auditor with the Clerk of the Supreme Court, provided, however, that any failure of the State Auditor to file such transcript with the Clerk of the Supreme Court shall not operate to defeat the appeal, but, in such event, it shall be the duty of the Supreme Court to require the State Auditor to file such transcript. The State Auditor shall immediately give written notice by mail to the attorney of record for the protestant and to the county attorney of the fact and date of the filing by him of the transcript on appeal with the Clerk of the Supreme Court. Within ten days after the filing of such transcript on appeal the party appealing shall file in said cause with the Clerk of the Supreme Court a petition in error, which together with

said transcript shall constitute the record on appeal. The appeal shall be docketed and determined without cost to either party and the Supreme Court shall, as soon as practicable, set the case for hearing after briefs have been filed under the rules and orders of the court.

"Section 8. After the decision of the Supreme Court in any case becomes final, the clerk of said court shall issue and transmit a proper mandate to the State Auditor, who shall thereupon transmit certified copies thereof to the county clerk, county treasurer and the attorney of record for the protestant, and the county clerk shall thereupon immediately correct the appropriations in accordance with said mandate and as herein provided in cases where no appeal is taken.

"Section 9. The filing of a protest as herein provided shall not prevent the spreading of record and the collection of any levy made by the excise board, but if any protest be filed as herein provided and any taxes shall be paid pending the hearing and determination of said protest, or pending the decision of the Supreme Court, all that part of the levy alleged in said protest to be illegal shall be retained by the county treasurer in a separate fund until the legality of said levy has been determined, and all taxes paid by any taxpayer in excess of the amount finally determined to be legal shall be refunded by the county treasurer to the taxpayer together with such interest thereon as may have been received by the county treasurer on such fund pending final determination of the illegality of such levy, upon verified claim filed with the county clerk at any time within six months after such final determination.

"It shall be the duty of the county clerk within 30 days from the final determination of the illegality of any levy to notify all taxpayers by publication in one issue of a newspaper of general circulation in the county that refund will be made of excess tax collected.

"If no demand is made for refund within said period of six months, said taxes so collected and held shall be distributed to the fund or funds for which they were levied and collected and credited as a surplus therein for the next succeeding fiscal year.

"Section 10. Nothing herein shall be construed to affect the time for payment and collection of taxes as now provided by law.

"Section 11. Pending the expiration of the time within which protest may be filed with the State Auditor no warrant shall be issued or debt contracted by any municipality for any purpose except as provided hereinafter.

"Counties: For salaries and compensation of each officer and all regular deputies and employes thereunder, for office supplies, blank books, stationery and printing, for postage, telephone and telegraph, for light, fuel and water, for rent, for support, maintenance and transportation of poor and insane, for jurors, witnesses for each court of record, for bailiffs and transcripts for each court of record, for fees of justices of the peace and constables, for each item of court expense as may be necessary and authorized by law, for election expenses, including salaries per diem, for aid to county normal institute, for insurance on county property, for annual audits and examination of fiscal affairs of the county, for the separate schools of the county, if any, in so far as the salaries of teachers, and all other maintenance expense in each district is concerned; and in such amounts as may be necessary to provide accommodations, facilities and school term in the separate schools, if any, in each district in the county equal to the accommodations, facilities and school term provided for the other regular public schools in the same district, for county high school, if any, in so far as the salaries of teachers and other necessary maintenance expense is concerned. and for aid to the common schools of the county.

"Cities and Towns: For salaries and compensation of each officer and all regular deputies, employes thereunder; for office supplies, blank books, stationery and printing; for postage, telephone and telegraph; for express, freight and drayage; for light, fuel and water; for rent; for charities and aid to the poor and for maintenance and for insurance.

"Townships: For salaries and compensation of officers; for office supplies, blank books, stationery and printing; and for compensation of supervisors.

"School Districts: For salaries and compensation of officers and clerical employes; for salaries and compensation of teachers; for office supplies, blank books, stationery and printing, for light, fuel and water; for library and school apparatus; for maintenance of buildings and grounds including salaries of janitors and caretakers.

"And further provided, that pending the final determination of any protested levy no warrant shall be issued or debt contracted against any contested portion of any fund, except for the purposes hereinbefore provided.

"Section 12. All acts and parts of acts in conflict herewith are hereby repealed."

The numerous objections to the validity of the foregoing act may be summarized as follows:

(a) That said court is without authority to change the budgets and levies already made by the various counties of the state under laws existing prior to the adoption of said act.

(b)   That the certificate of the Secretary of the State Election Board is insufficient to show that said measure was legally adopted because it shows only the total vote cast on the special measure itself and does not show the aggregate total vote cast on all questions voted upon at the state primary, the contention being that the measure should receive a majority of all ballots cast on all matters voted upon at such election.

(c)   That said act is violative of section 19, art. 10, of the Constitution, in that it provides for the payment of money appropriated for other specified purposes.

(d)   That said act is violative of section 55, art. 5, of the Constitution, which provides that no money shall ever be paid out of the state treasury except in pursuance of an appropriation by law, which shall distinctly specify the sum appropriated and the object to which it shall be applied.

(e)   That the act is violative of section 11, art. 2, of the Constitution, in that it attempts to confer authority on the Governor to assign district judges out of their districts to perform duties other than those to which they were elected or appointed.

(f)   That the act is violative of section 10, art. 7, of the Constitution, in that it attempts to divest district judges of jurisdiction to hear and determine the validity of tax levies already protested within their said districts.

(g)   That the act is violative of section 1, art. 4, of the Constitution, in that it attempts to vest the executive department with authority to interfere with the constitutional functions of the judicial department.

(h)   That said act is violative of section 6, art. 2, of the Constitution, in that it attempts to compel officers of the several counties of the state to leave their counties and appear at the Capitol to defend their rights. That such attempt amounts to denial of due process of law by delay and prejudice to the rights of the several counties in violation of the spirit and intent of the Constitution.

(i)   That said act is violative of section 7, art. 2, of the Constitution, in that the procedure prescribed therein denies the various counties of due process of law.

(j)   That said act is violative of article 7 of the amendments to the Constitution of the United States of America, and of section 19, art. 2, of the Constitution of the state of Oklahoma, in that it attempts to deprive litigants of the right of trial by jury.

(k)   That said act because of its attempted unjust discrimination between different counties, its failure to make provision for the payment of costs, its attempted provision that all litigation arising under said act shall be without cost to either party, thereby holding out an inducement for the filing of indiscriminate and unmerited proceedings against the sound public policy of the state.

(l)   That said act is null because its provisions are impossible of application and of operation, in that it fails to provide any method for the per diem of witnesses, or for the expense of the operation of the court of tax review, or for the compensation of necessary court reporters to take and transcribe the proceedings of the court.

(7)   Petitioner in error alleges that there is no existing adequate remedy at law, wherefore he prays for a writ of prohibition.

The foregoing objections will be reviewed in the order designated:

(a)   As to the objections argued under this proposition, we cannot anticipate what the Court of Tax Review will do or may do as to budgets or levies already made in the various counties under the law existing prior to the adoption of the act in question. Nor can we presume in advance that such court will not decide such matters according to law as may be brought before it, nor can we presume in advance that it will attempt to exceed its jurisdiction under the law. The rule of presumption is to the contrary. These questions are not properly before us. The only question of which this court can properly take cognizance and the only one over which it has consented to exercise original jurisdiction in this proceeding is, whether the primary purposes of the act in question are so clearly violative of the Constitution of the state that it gives no power nor confers any jurisdiction upon the Court of Tax Review to do anything under the provisions of the act. The primary purposes of the act are to provide a remedy against illegal tax levies and to create a tribunal with power to grant prompt relief, and the constitutionality of these purposes is all that is before us.

(b)   We cannot sustain the contention made under proposition (b) that where an initiative measure is submitted at some election, other than a special election, called by the Governor, it must receive a majority of all votes cast on other matters and upon all matters voted upon at such election in order to be valid. Section 3, art. 5, which plaintiff un-

der proposition (b) contends is violated by the act in question, provides as follows:

"All elections on measures referred to the people of the state shall be had at the next election held throughout the state, except when the Legislature or the Governor shall order a special election for the express purpose of making such reference. Any measure referred to the people by the initiative shall take effect and be in force when it shall have been approved by a majority of the votes cast in such election."

The words **"such election"** and **"all elections,"** used above, have reference to the election upon the special measure which the people have petitioned the Governor to have submitted, and which has been submitted to them by the Governor. The people in the instant case have petitioned the Governor for an election upon the special measure in question. In response to their petition the Governor has submitted such measure to be voted upon, and when it received a majority of all votes cast upon the measure petitioned for and submitted, it was legally adopted.

Said section further provides:

"Petitions and orders for the initiative and for the referendum shall be filed with the Secretary of State and addressed to the Governor of the state, who shall submit the same to the people."

The words "shall submit the same" mean the specific question petitioned for by the people and submitted to them to be adopted or rejected by a majority of their votes upon the same. Had the initiative measure in question been submitted to the people to be voted upon at a special election called for that express purpose, no one would contend that it would have been required to receive more than a majority of votes cast at such special election, and the fact that it was submitted at a general primary election does not place a greater burden upon its passage, nor upon those who petitioned its submission than would have been had it been submitted at a special election.

Under this proposition it is also contended that there is such variance between the ballot title and the title of the act as to render the act null and void. The ballot title in question is as follows:

"All tax levies filed with State Auditor and with county clerks open to inspection. Notice published in each county. Notice mailed to taxpayers on written request. Protest against tax levies may be filed with State Auditor or with county clerk. Excise board may reduce levy, otherwise case to be heard by Court of Tax Reviews composed of three district judges who meet at State Capitol the first Monday in October, and of each month thereafter until all cases are determined. Procedure for prompt appeal without cost. All taxpayers entitled to benefits of decision. Warrants issued during the proceedings limited to fixed expenses."

We can see no fatal nor misleading variance between the matters suggested in ballot title and those contained in the title of the act herein set out. We think that all provisions included in the title of the act are substantially included in the ballot title, and furthermore that the title of the act itself is sufficiently broad to cover all provisions made in the act itself and more. Hence this contention cannot be sustained.

Propositions (c) and (d) are argued together.

In said propositions it is contended that sections 3 and 4 of the act are respectively violative of section 19, art. 10, of the Constitution, and of section 55, art. 5, of the Constitution. That section 3 of the act is violative of that provision of section 19, art. 10, of the Constitution, to wit:

"That every act enacted by the Legislature levying a tax shall 'specifically and distinctly state' the purpose for which the tax is levied," etc.

And that both sections 3 and 4 of the act are violative of that provision of section 55, art. 5, to wit:

That "no money shall ever be paid out of the treasury of this state. * * * nor any of the funds under its management, except in pursuance of an appropriation by law" —and of the further provision:

That the appropriation "shall distinctly specify the sum appropriated and the object to which it" shall "be applied."

These contentions cannot be sustained, for the reason that neither section 3 nor section 4 of the act levies a tax or makes an appropriation; nor do both of said sections, construed together, make either a tax levy or an appropriation. The provision in section 3 of the act which provides that the expenses of the judges of said Court of Tax Review shall be paid out of funds appropriated for the payment of expenses of district judges when assigned out of their districts pertains to the operative provisions, that is, the working provisions of the act, and not to the primary purpose of the act. The question before us now is, not whether the provisions of the act have been correctly operated or applied nor whether they have been or are to be enforced in violation of the Constitution, but the question here

is, whether the purposes of the act itself are unconstitutional, whether, by the adoption of its main purposes, legislative power under the Constitution has been exceeded. In this proceeding, it is not for us to say what may be done nor how it shall be done, but to say whether or not anything can be done.

We will say, however, that if there be no available funds for the legal payment of the operating expenses of said court, then the Governor and the Legislature have power to take care of the situation. There is nothing before us which shows that any funds have been or are about to be illegally paid out.

Under proposition (e) it is argued that said act is violative of section 11, art. 2, of the Constitution, which provides that every person elected or appointed to any office under the laws of the state shall give personal attention to the duties of the office to which he is elected. The principal objection to the provisions of the act is that it authorizes the sending of district judges out of their districts and away from the regular duties to which they were elected. This provision, however is not violative of the Constitution, for two principal reasons:

(1) The basic principle of sending district judges out of their districts is authorized by the Constitution. See section 9, art. 7.

(2) The Constitution authorizes the creation of such additional courts, boards and commissions, inferior to the Supreme Court, as may be created by law. See section 1, art. 7. And with such exclusive jurisdiction as may be conferred by law. Section 10, art. 7.

Hence the basic principle of assigning district judges out of their districts, is not out of harmony with the provisions of the Constitution. As to the contention that it will take district judges away from the constitutional duties which they are elected to perform, such contention pertains to the operative provisions of the act, and this court cannot say whether or not such provision will be abused. There is nothing in the act compelling district judges to leave their duties for the purpose of discharging the duties imposed by the act. As to the authority of the Chief Justice to assign judges out of their districts, such authority has never been exercised so as to arbitrarily take a district judge away from his duties. We know of no instance wherein a district judge has ever been assigned out of his district except where such judge felt that the duties of his district were not

pressing and was willing to accept the assignment. The will and convenience of the judge himself has at all times been consulted. And there being no provision in the act in question for compelling district judges to neglect their duties, we see no violation of the basic law.

Furthermore, should it develop that the duties of the Court of Tax Review should entail such additional duties as to render it impossible for them to attend to the regular duties of their respective districts, then the Legislature has power to take care of the situation.

Under proposition (f) it is contended that the act in question violates section 10, art. 7, which provides as follows:

"The district courts shall have original jurisdiction in all cases, civil and criminal, except where exclusive jurisdiction is by this Constitution, or by law, conferred on some other court, and such appellate jurisdiction as may be provided in this Constitution, or by law."

It appears to us that the above constitutional provision in itself sufficiently answers the contention made under this proposition. It is clear from the above provision from section 10, art. 7, of the Constitution, that district courts shall retain their original jurisdiction only until exclusive jurisdiction is by law conferred upon some other court. Hence, notwithstanding the fact that under the provisions of the Constitution the district courts are given original jurisdiction and appellate jurisdiction in certain matters, yet the Constitution authorizes the creation of other courts upon which may be conferred exclusive jurisdiction, and this, it seems to us, is what is attempted to be done by the act in question. The attempt in itself is not violative of the Constitution. If the provisions of the act are inadequate or insufficient to carry out the intent and purpose of the act, then the Legislature has power to cure the defects. As for the provision in the act itself that the excise board (impliedly meaning the county excise board) may convene and reduce budgets and levies, such provision does not in our opinion affect the constitutionality of that portion of the act purporting to confer exclusive jurisdiction upon the Court of Tax Review.

Under proposition (g) it is contended that said act violates that portion of section 1, art. 4, of the Constitution, which provides:

"The legislative, executive and judicial departments of government shall be separate and distinct, and neither shall exercise the

powers properly belonging to either of the others."

It is contended that the foregoing provision is violated by the provision of the act in question which gives the Governor power to appoint the members of the Court of Tax Review. It is argued, in effect, that the Governor might so abuse his power as to perpetually keep the appointed judges in office or to remove them at his own arbitrary will, thus encroaching upon both the functions of the Legislature and the judiciary. We cannot anticipate that the Governor will thus abuse his power. Should he attempt to do so, then the courts and the Legislature can take care of the situation. Besides, in no event could the Governor perpetuate an appointee in office after the expiration of his own term.

Propositions (h), (i), and (j) are presented together. It is contended that the provisions of the act in question providing that the terms of said court shall be held at the Capitol is violative of sections 6 and 7 of article 2 of the Constitution, which, in substance, provide that the courts of justice of the state shall be open to every person, that speedy and certain remedy shall be afforded for every wrong, and that right and justice shall be administered without sale, denial, delay, or prejudice, and that no person shall be deprived of life, liberty, or property, without due process of law.

It is argued that the above constitutional provisions are violated by the provisions in the act requiring taxpayers, and especially county officers of the various counties of the state, to incur the expense of leaving their counties and coming to the Capitol for the purpose of defending their rights; that such provision is equivalent to denial of due process of law and denial of speedy justice and of adequate relief. As to this contention, we will say that so long as all counties and taxpayers are given their "day in court," given the same rights and remedies, and are afforded the same process, the purposes of the act being within constitutional limitations, due process of law is not denied. As to whether the provisions of the act will work a hardship upon the counties and taxpayers, it is not the province of this court to say; it is the province of the legislative department to determine the wisdom of laws and whether they will work a hardship upon the citizens, unless they impose such hardship as to amount to a denial of their rights to speedy justice, and so far as we can see the provisions of the act in question may provide a more speedy, more adequate, and

less expensive remedy for adjusting illegal taxes than is provided for in our present law. We cannot say as to this until its remedies are resorted to and its advantages or disadvantages ascertained and passed upon and the matter properly brought before this court for review.

It is further contended under the above proposition that the right of trial by jury is denied. It is contended that the act violates that provision of section 19, art. 2, of the Constitution, to wit:

"The right of trial by jury shall be and remain inviolate."

This contention is answered, in the first place, by the fact that the act in question does not specifically deny the right of trial by jury.

In the second place, the provision that the right of trial by jury shall be and remain inviolate means the right which existed at the time the Constitution was adopted. See C. J. p. 154, and authorities cited under note 86, p. 155.

This proposition is so elementary that we deem it unnecessary to incumber the Reports with further citation of authorities. If the Constitution had designated or attempted to designate or specify the character of issues for which a trial by jury, as a matter of constitutional rights, may be demanded, the rule would be different, but the constitutional provision in section 19, supra, pertains only to such right as then existed at the time of the adoption of said provision. The rights then existing were clearly defined by statute taken from the state of Kansas, which had been construed, upheld, and applied. The same statutes are now in force in this state, wherein the right of trial by jury of issues involved in civil actions are clearly defined. We cannot say in advance that those defined rights will be denied by the Court of Tax Review, where the persons demanding such rights are entitled to same under statute. If there be no provision for selecting a jury, the Legislature has power to prescribe one if it sees fit to do so.

Propositions (k) and (l) are presented together in petitioner's brief. Under the two propositions it is argued that the act in question is against sound public policy; citing and quoting from 32 Cyc. 125.

The answer to this contention is that the act itself is the declared policy of the state. In this act the people of the state in the exercise of their legislative powers have declared the state's policy on the subject enacted.

"The public policy which dictates the enactment of a law is determined by the wisdom of the Legislature." Enders v. Enders (Pa.) 30 Atl. 129, 27 L. R. A. 56, Am. St. Rep. 598.

"Public policy is but the manifest will of the state." Jacoway v. Denton, 25 Ark. 625.

In the instant case, the will of the state has been manifested in and through the act in question.

It is further contended that the act in question is against the public policy of the state as expressed in section 11, art. 2, of the Constitution, which requires all officers to give personal attention to the duties of the office to which they are elected or appointed.

The question as to whether the act is violative of section 11, art. 2, has already been herein discussed and passed upon.

And in conclusion it is argued that the act itself is impossible of intelligent application and operation.

The question as to whether the provisions of the act can be so applied as to carry out the purposes of the act or whether they may be so applied as to defeat the purposes of the act is not before us. We will not assume to say how the Court of Tax Review is going to apply the provisions of the act and until such court makes some erroneous application of the provisions of the act and such application or attempted application is properly brought before this court; the matter will not be passed upon.

As heretofore stated, it is only the constitutionality of the primary purpose of the act that is before us, the primary purpose of the act being to provide a remedy against illegal tax levies and to create a court with power to grant prompt relief.

Section 36, art. 5, of the Constitution extends the legislative power of the state to all needful subjects of legislation. Certainly no one will contend that a remedy against illegal tax levies is not a needful subject of legislation. To our minds, there is no subject which is more needful of legislation. The power of the Legislature to create additional courts and define the powers has already been herein determined.

It is not the province of this court in this proceeding to either laud the wisdom of its working provisions or to condemn them for lack of wisdom. If its provisions be found to be inoperative or nonworkable or inapplicable, the Legislature has power to make the necessary amendments. It may or may not be found by the Court of Tax Review to be in need of material amendments to its operative provisions. We suggest, however, that such court may find it necessary for the Legislature to enact a subject and verb into the four subparagraphs of section 11, of the act, to wit: Counties; Cities and Towns; Townships; School Districts. These four subparagraphs contain some forty odd prepositional phrases and more than 300 words, but contain neither subject nor predicate, as apparently indicated by the punctuation of section 11 of the act as printed.

Having determined that the purposes of the bill are not violative of the provisions of the Constitution, which petitioner contends are violated, and that the proper manner of applying the operative features of the act is not before us, the writ of prohibition is denied.

PHELPS, LESTER, HUNT, CLARK, and HEFNER, JJ., concur.

BRANSON, C. J., MASON, V. C. J., and RILEY, J., dissent.

---

BRANSON, C. J. (dissenting). The action is by all parties admittedly brought to determine whether or not State Question No. 100, described in the majority opinion, is a constitutional enactment. The writer dissents reluctantly, for he is not unaware that the complicated tax system in Oklahoma has worked great injustice, as well as in many instances long delays. But, as was suggested at the time of the oral presentation of this cause, this is largely due to the tax levying authorities in the various counties and municipal subdivisions in the state resolving every possible doubt in the tax statutes in favor of taking more revenue from the heavily burdened taxpayers, instead of resolving the doubt in their favor, whenever any exists under the various provisions authorizing tax levies. As it appears to the writer, the evil cannot be remedied by an unworkable enactment such as the matter now before the court, even if by stretching the constitutional provisions, because we have such power arbitrary, we may hold it not violative thereof.

An elucidation in regard to each proposition will not be attempted. The writer is not unaware that propaganda in behalf of a matter of this sort spread out to the people as a matter of common knowledge, was done in the instant case, securing public acclaim, with but few individuals knowing one thing about the evil existing, and whether or not the proposed remedy will cure. Each recurring Legislature, to say nothing of initiative provisions, has, without

a proper comprehension of the tax code of Oklahoma, thrown a boulder into the delicately adjusted machinery for raising revenue.

The matter before the court purports to be a legislative enactment adopted by virtue of section 3, article 5, of the Constitution of the state, and the statutes vitalizing the same. In regard to initiative measures, the Constitution says:

"Any measure referred to the people by the initiative shall take effect and be in force when it shall have been approved by a majority of the votes cast in such election."

There are three characters of state-wide elections in Oklahoma, and only three.

First. The regular election, held in November each two years. This is required by law.

Second. The mandatory primary election, held the first Tuesday in August each two years. This is required by law.

Third. A special election, which may be ordered by the Legislature of the state, if done in a proper manner, or ordered by the Governor of the state, in accordance with legislative authority.

Section 6653, C. O. S. 1921, which was an act of the Legislature of 1916, provides:

"Whenever any measure shall be initiated by the people in the manner provided by law * * * same shall be submitted to the people for their approval or rejection at the next regular election; provided, the Governor shall have power in his discretion to call a special election to vote upon such questions or to designate the mandatory primary election as a special election for such purpose."

This section clearly recognizes the three classes of elections above mentioned. Had it gone to the regular November election, certainly there must have been cast for it affirmatively a majority of all votes cast in the election. The fact that it authorizes the Governor to designate the mandatory primary at which such a question may be voted on in no manner alters the character of a mandatory primary election into that of a special election on an initiative measure. The said section 3, article 5, in language too plain to be interpolated out of existence, says the measure must receive a majority of the votes cast in such election. This mandatory primary is as much required by law as the November election—and it is held because of the Constitution and statutes of the state—not by reason of the call of the Governor. Perhaps it did receive a majority of the votes cast in the primary throughout the state. Other sections of the statute require the precinct officers and the county

officers in turn to certify to the State Election Board a record showing just how many persons voted in the election, and that 'the State Election Board shall certify the same to the Secretary of State, where it shall be made a permanent record. Certainly there was a basic purpose for this, to wit, that the initiative matter might be affirmatively shown by the permanent records of the office of the Secretary of State to have been adopted under the sole provision of law, to wit, article 5, section 3, of the Constitution, that would give it any validity. It is required by law that the ballot on the initiative measure shall be given by the precinct election officers to every voter who presents himself.

Why, then, should any difference exist as to the ratio required to adopt? The opinion loses sight of the force of the phrase "In the election." What was its force?

It must be borne in mind, we have before us the attempted exercise of the power reserved by the people to legislate directly. The electorate on the day of the election is in fact the Legislature! Strongly analogous to the constitutional requirement that a bill before the Legislature shall receive on final passage a majority of all persons elected to and constituting the Senate and the House. Did the Constitution not so provide as small a number as 28 members of the House might, with a corresponding ratio of the Senate, enact a proposed bill into a law, So, too, if we read out of existence the constitutional provision on direct legislation, to wit, the initiative, that the proposed bill shall have a majority of all votes cast "in such election," this salutary provision of the basic law of the state is reduced to as much an absurdity as if the Legislature could pass a bill without a constitutional majority. For, may we not ask, where is the stop line, if it is not to be found in that portion of the Constitution above quoted? Every elector given a ballot on the proposed initiative measure becomes a voter in the election, and upon his action, whether it be for or against the measure, or whether he refuses to vote on it at all, and he is a factor to be considered in determining whether it was adopted or rejected. If he votes at all in the election, he must be included in the sum total of all voters in the election, certified to the Secretary of State. May we not go a little further—the record, if there were any, as required by law, in the office of the Secretary of State would doubtless show more than 600,000 of the initiative ballots given to electors throughout the state who voted in the election. If only two in the

entire state saw fit to vote for the proposed measure, and one against it, the reasoning of the majority opinion would declare the proposed measure adopted as the law of the state. Such an interpretation is an innovation on constitutional legislation, whether it be by the Legislaure or directly by the people, and its effect is that section 3 of article 5, requiring that a matter initiated shall receive a majority of votes cast in the election, means nothing.

There is nothing before this court that even indicates that the record of the Secretary of State's office shows that this matter received a majority of the votes cast in the election.

Second, the opinion sustains the provision authorizing the Governor to select three district judges to compose this court. District judges are constitutional officers. They preside over constitutional courts. It is not argumentative in support of the proposition here to say that because the Constitution authorizes the Chief Justice, when necessary, to assign district judges from one district to another, that an act of this sort is not foreign to any power given the Legislature. The Legislature has power to increase the number of the members of the Supreme Court of the state. If it saw fit to do so, it could just as well authorize the Governor to designate certain district judges to be members of the Supreme Court of the state, while they were judges of district courts of the state, as to designate them to be judges of the court here sought to be created. Unquestionably the Legislature might put upon constitutional officers additional duties within their jurisdiction, but it is an innovation, to put it mildly, to create a new court, and make judges of courts created by the Constitution judges of such new court, especially when the Constitution itself provides that constitutional officers shall give all of their time to the performance of their official duties, and the duty here imposed is one to be performed by a court altogether separate and distinct from the district court, but to be composed of district judges. The incongruousness of such an attempt at legislation is mirrored in its absolute futility, if, which he would have a right to do, every district judge in the state refused to leave his constitutional post of duty and perform this pretended statutory duty in a place where he is not authorized to perform duties as a constitutional officer. If this should happen, the pretended bill would break down of its own provisions, for there is nothing therein that gives anybody any authority to require the district judges to perform these

duties; neither are they required to take any oath of office. They have no power to pay witnesses, and no money or means of getting it. It is called a court, but it lacks every element of being a court, or any tribunal that can in any wise function, unless some constitutional officer known as a district judge sees fit to leave the performance of his sworn duties as judge of his district, and come to the seat of government, and go through the performance of pretending to act as a court outside of the jurisdiction which the Constitution vests in the court of which he is judge.

These are only a few of the many reasons why the writer cannot concur in this opinion.