Frank KEATING, Governor of Oklahoma; Fred Morgan, State Representative; and Chris Hastings, State Representative, Petitioners,

v.

Glen D. JOHNSON, Speaker of the Oklahoma House of Representatives; Stratton Taylor, President Pro Tempore of the Oklahoma Senate; Terry Tyree, in his capacity as Acting Commissioner of the State Insurance Fund; Carlisle Mabrey, III; H.E. Rainbolt; Phil Tholen; Mike Nobles; Senator Ted Fisher; Senator Kevin Easley; Senator Larry Dickerson; Representative Don McCorkell; Representative James E. Hamilton;

Representative Bill Settle; Bob Hollander, in his capacity as Executive Director of the Oklahoma Firefighters Pension and Retirement Board; Meridith Lacey; and Gene Torbett, Respondents.

No. 86628.

Supreme Court of Oklahoma.

May 14, 1996.

Joe Heaton, Fuller, Tubb & Pomeroy, Special Counsel to the Governor, Oklahoma City, Fred Morgan, Reynolds, Ridings, Vogt & Morgan, Oklahoma City, and Chris Hastings, Tulsa, pro se and Co–Counsel to the Governor, Duchess Bartmess, General Counsel to the Governor, Oklahoma City, for Petitioners.

Susan B. Loving, Oklahoma City, and Lee Slater, Oklahoma City, for Respondents Speaker Glen D. Johnson, President Pro Tempore Stratton Taylor, Senators Ted Fisher, Kevin Easley and Larry Dickerson

and Representatives Don McCorkell, James E. Hamilton and Bill Settle.

Scott C. Emerson, Chief Counsel, Oklahoma House of Representatives, for Respondent Speaker Glen D. Johnson.

Mark H. Ramsey, Senior Staff Attorney, Oklahoma Senate, for Respondents President pro tempore Stratton Taylor and Speaker Glen D. Johnson.

Stephen G. Solomon, Gladys E. Cherry, Derryberry, Quigley, Solomon, Blankenship & Naifeh, Oklahoma City, and Elizabeth Bradford, General Counsel, Oklahoma City, for Respondents Terry Tyree, Carlisle Mabrey, III, H.E. Rainbolt, Phil Tholen and Mike Nobles.

Marc Edwards, A.P. Murrah, Jr., Phillips McFall McCaffrey McVay & Murrah, Oklahoma City, for Respondents Bob Hollander, Meridith Lacey and Gene Torbett.

John Morris Williams, Oklahoma City, for amicus curiae Oklahoma Education Association.

Richard A. Mildren, Riggs, Abney, Neal, Turpen, Orbison & Lewis, Oklahoma City, for amicus curiae Oklahoma Public Employees Association and Oklahoma Firefighters Association.

LAVENDER, Justice:

Petitioners, the Governor of the State of Oklahoma and two State House of Representative members have filed an application with this Court to assume original jurisdiction requesting declaratory or other relief determining that the Oklahoma Legislature violates the separation of powers doctrine contained in the Oklahoma Constitution [OKLA.CONST. art. 4, § 1] when it, by statutory enactment, vests in itself or legislative leadership the authority to make appointments to executive branch boards and commissions whose function is the execution and administration of the law.[1] Unconstitutionality is also claimed when the Legislature, by statute, delegates to any of its own members either the power to exercise executive functions or the power to exercise legislative, policy-making powers on behalf of the Legislature as a whole. Sued as respondents are the Speaker of the Oklahoma House of Representatives; the President Pro Tempore of the Oklahoma Senate; three other State Representatives and three other Senators who are members of the Legislative Bond Oversight Commission (LBOC); the Acting Commissioner of the State Insurance Fund; four members of the Board of Managers of the State Insurance Fund (BMSIF) (two appointed by the Speaker and two by the President Pro Tempore); the Executive Director of the Oklahoma Firefighters Pension and Retirement System; and two members of the Oklahoma Firefighters Pension and Retirement Board (OFPRB), one appointed by the Speaker and one by the President Pro Tempore. We decline to assume original jurisdiction for the reasons set forth below.

Petitioners attack as unconstitutional four statutes or statutory schemes in this proceeding. They claim 85 O.S.1991, § 131a is unconstitutional to the extent it provides for appointment of members to the BMSIF by the Speaker and President Pro Tempore. 11 O.S.Supp.1995, § 49–100.3 is claimed unconstitutional insofar as it provides for appointment of members to the OFPRB by the Speaker and President Pro Tempore. Next, the Oklahoma Bond Oversight and Reform Act, 62 O.S.1991, § 695.1 et seq., as amended, is claimed unconstitutional to the extent it provides for the LBOC, currently made up of six legislators as members, to engage in the performance of executive functions, rather than legislative.[2] Alternatively, petitioners

1. OKLA. CONST. art. 4, § 1 provides:

The powers of the government of the State of Oklahoma shall be divided into three separate departments: The Legislative, Executive, and Judicial; and except as provided in this Constitution, the Legislative, Executive, and Judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others.

2. The Speaker and the President Pro Tempore each appoint three members to the Legislative Bond Oversight Commission (LBOC). 62 O.S.Supp.1995, § 695.4(A)(1) and (2). The Speaker and President Pro Tempore are also given appointment authority for one alternate member each, who is to serve when a regular member is not available. § 695.4(B). In view of such legislative leadership appointment authority, we note that petitioners also appear to challenge such appointment authority based on the

claim that if any of the LBOC's powers are determined to be legislative in nature, rather than executive, the LBOC would still be unconstitutional—the invalidity consisting of an improper delegation of legislative power of the whole Legislature to that six person commission. Finally, 62 O.S.1991, § 695.11A, is claimed violative of the separation of powers doctrine in providing for appointment of members to the Council of Bond Oversight (CBO) (a Council that would come into being in the event either the LBOC or its counterpart, the Executive Bond Oversight Commission, are found unconstitutional) by the Speaker and President Pro Tempore, when the CBO wields executive power. It should be noted that petitioners cite to Attorney General Opinion No. 90–31, which generally is favorable to the position of petitioners espoused herein, but the Legislature has apparently ignored this opinion of the Attorney General.

In addition to a declaration of constitutional invalidity, petitioners request a further declaration, if allowed by applicable constitutional principles and prior decisions of this Court, that by reason of the *de facto* status of the various officers who are claimed to have been unconstitutionally appointed, all prior actions taken by the officers or their respective board, council or commission are valid and binding against constitutional infirmities alleged in this proceeding, notwithstanding such infirmities. Finally, petitioners request, again if allowed by applicable constitutional principles and prior decisions of this Court,

that we make any decision of unconstitutionality effective at a future date certain or, withhold issuance of any writ or appropriate order until a date certain to give the Legislature and Governor sufficient time to cure the claimed unconstitutional defects in the challenged legislation.

The Governor claims standing to bring this matter on the basis he is the Chief Magistrate and chief executive officer of Oklahoma [OKLA.CONST. art. 6, §§ 1 and 2], and, as such, he has a judicially cognizable interest in protecting the prerogatives and functions of the Executive Department of State government and insuring that another Department of State government does not unlawfully assume or exercise powers properly committed to another Department.[3] Further, although the Governor does not presently claim he is imbued with any inherent authority to make the appointments to the boards, etc. at issue in this proceeding either under the Oklahoma Constitution or otherwise, he claims that his role in the appointment process under OKLA.CONST. art. 6, § 13 also provides a basis for his standing here.[4] As to this latter position, the Governor appeared to claim at oral argument in this matter that because art. 6, § 13 gives him certain appointment authority when an office becomes vacant, upon a determination that the statutes granting the legislative appointments at issue here are held to be unconstitutional and legislative failure to pass curative legislation passing constitutional muster, he might himself be-

same view espoused as to the other alleged executive entities involved here, i.e. the LBOC exercises executive authority and legislative leadership appointment to it violates the separation of powers doctrine.

3. OKLA. CONST. art. 6, § 1 provides:

A. The Executive authority of the state shall be vested in a Governor, Lieutenant Governor, Secretary of State, State Auditor and Inspector, Attorney General, State Treasurer, Superintendent of Public Instruction, Commissioner of Labor, Commissioner of Insurance and other officers provided by law and this Constitution, each of whom shall keep his office and public records, books and papers at the seat of government, and shall perform such duties as may be designated in this Constitution or prescribed by law.

B. The Secretary of State shall be appointed by the Governor by and with the consent of

the Senate for a term of four (4) years to run concurrently with the term of the Governor. OKLA. CONST. art. 6, § 2 provides:

The Supreme Executive power shall be vested in a Chief Magistrate, who shall be styled "The Governor of the State of Oklahoma."

4. OKLA. CONST. art. 6, § 13 provides:

The Governor shall commission all officers not otherwise commissioned by law. All commissions shall run in the name and by the authority of the "State of Oklahoma," be signed by the Governor, sealed with the Great Seal of the State of Oklahoma, and attested by the Secretary of State. When any office shall become vacant, he shall, unless otherwise provided by law, appoint a person to fill such vacancy, who shall continue in office until a successor shall have been duly elected or appointed, and qualified according to law.

come imbued with the appointment authority. However, as noted, the Governor does not currently claim any appointment authority and he appears to admit that constitutionally adequate curative legislation might be passed consistent with art. 6, § 13 that would place the appointment power in others.

The two House member petitioners claim standing based on a judicially cognizable interest in the proper allocation of powers between the Executive and Legislative Departments and, alternatively, a dilution or impairment of their legislative vote as House members by the claimed improper delegation of legislative authority to the LBOC. We assume, without deciding, that both the Governor and the two legislators have standing to bring this proceeding.

Petitioners, to support their position that we exercise our discretion to grant original jurisdiction, rely on the doctrine of *publici juris* in that this matter is imbued with great public importance involving a question of statewide concern relating to the respective powers of the Executive and Legislative Branches of government. The claim is that this public law controversy raises issues going to the fundamental structure of government in Oklahoma. Although the former basis is primarily relied upon, it is also claimed we should assume original jurisdiction based upon our superintending control over agencies, commissions and boards granted to this Court in OKLA.CONST. art 7, § 4. Petitioners also appear to argue that because the matter will eventually end up in this Court in an appeal from a district court determination in any event, and we at that time will have to review the legal questions under a *de novo* standard of review, original

jurisdiction should be assumed now, and that declining to do so will accomplish nothing, other than causing a delay of a final decision and expense to the parties.

Other than as to how these bases might intrinsically intertwine with the issue, petitioners make no real attempt to convince us there is some urgent situation involved in this matter that would call for this Court's immediate attention or that would require a speedy determination of the case. In fact, the present posture of the case as delivered to us by petitioners, particularly in light of their own request that we make any decision prospective to a future date to afford the Governor and Legislature time to enact curative legislation should we decide one or more of the challenged provisions are unconstitutional and the tacit admission that past actions of the officials whose appointments are challenged are valid by virtue of their claimed *de facto* status, appears to counsel against a determination there is any need for our immediate attention. In our view, although the question(s) presented are important, petitioners have failed to show there is some immediacy involved in this controversy that would call for this Court to exercise its discretion to hear the matter at the present time.

We first note that although petitioners point out reasons why bypass of a State district court is in order, they have presented no argument or authority, and we are aware of none, that would give us exclusive jurisdiction of this matter. Thus, we begin our analysis on the assumption our jurisdiction in this case is concurrent with that of a district court.[5]

---

**5.** This fact of concurrent jurisdiction with that of a district court makes inapplicable here the case of *Southwestern Bell Telephone Co. v. Oklahoma Corporation Commission*, 873 P.2d 1001 (Okla. 1994), *cert. denied* —— U.S. ——, 115 S.Ct. 191, 130 L.Ed.2d 123 (1994), cited by one of the dissenting opinions. By virtue of OKLA. CONST. art. 9, § 20, this Court had exclusive jurisdiction in that case to issue any writ which would have had the effect of disqualifying one of the Corporation Commissioners. Section 20 makes explicit that no other court, **except this Court,** has the authority or power to interfere with the Corporation Commission in the performance of its official duties, e.g. regulation of the rates of Southwestern Bell. *State ex rel. Okla-*

*homa Natural Gas Co. v. Hughes*, 204 Okla. 134, 227 P.2d 666 (1950); *See also State ex rel. Cartwright v. Southwestern Bell Telephone Co.,* 662 P.2d 675 (Okla.1983) (Even though OKLA. CONST. art. 9, § 20 limits judicial review of orders of Corporation Commission affecting the rates, etc. of public utilities or public service corporations to this Court, these matters may be assigned by the Supreme Court to the Court of Appeals). Also inapplicable to and unlike the present situation is *Hooper v. The Honorable Lois L. Belden*, No. 79,998 (Okla. Sept. 28, 1992), another case cited in the same dissenting opinion, where the petitioner had already presented his *in forma pauperis* request to proceed in small

Early in our State's history it was recognized that this Court was by the framers of the Oklahoma Constitution intended primarily as an appellate court. *Jarman v. Mason*, 102 Okla. 278, 229 P. 459, 464 (1924). The following was further stated in *Kitchens v. McGowen*, 503 P.2d 218 *Syllabus by the Court* (Okla.1972):

> The original jurisdiction of the Supreme Court, when concurrent with that of the district court, is intended primarily as a "stand by" service which it will exercise only when, from the exigencies of the case, great injury will be done by its refusal so to do. A different rule would so flood this court with original actions as to destroy its efficiency as an appellate court.

We also recognized in *Jarman v. Mason, supra*, that all litigants would like to step into this Court of last resort, thereby avoiding the expense and delay incident to appeal, but that such reasons for bypass of the ordinary process of first proceeding in a lower court, would not normally be considered a reason for us to exercise our discretion to grant original jurisdiction. 229 P. at 464.[6] A fairly consistent theme running through most of our cases where original jurisdiction has been assumed has been that the matter must be affected with the public interest and there must be some urgency or pressing need for an early determination of the matter. *See e.g. Post Oak Oil Co. v. Oklahoma Tax Commission*, 575 P.2d 964, 967 (Okla.1978); *Halstead v. McHendry*, 566 P.2d 134, 136 (Okla. 1977); *See also Phillips v. Oklahoma Tax Commission*, 577 P.2d 1278, 1281 (Okla. 1978), where original jurisdiction was granted for the purpose of ascertaining the consti-

tutionality of a recent increase in Oklahoma's use tax and it was urged judicial resolution was essential to the orderly fiscal management and budgeting of both State and local governmental entities. All of the above cases indicated there was some immediacy involved so that a real need existed for speedy determination of the controversy. As noted above, the petitioners here have not really attempted to show any urgency or immediacy calling for an early decision by this Court in the present case.

Although we have assumed jurisdiction of original actions to rule on the constitutionality of legislative acts, our basis for doing so was a general public need for a speedy determination of the constitutional question. For example, in *State ex rel. Babb v. Mathews*, 134 Okla. 288, 273 P. 352 *First Syllabus* (1928), we assumed original jurisdiction in a case seeking a writ of prohibition to stop a newly created Court of Tax Review from exercising its authority. *Id.*, 273 P. at 352–353. We noted that the issue(s) involved went to the question of whether the primary purposes of the act (to provide a remedy for illegal tax levies and creation of a tribunal with power to grant prompt relief) were so clearly violative of constitutional provisions that the act involved in actuality gave no power to, nor conferred any jurisdiction on, the court of tax review to function at all under the act's provisions. *Id.*, 273 P. at 356. Although we denied the writ, had we granted it the Court of Tax Review would have been prohibited from entering upon its duties as spelled out in an initiative petition recently passed by the voters, i.e. an organ of government having as its central purpose the pro-

---

claims court to the Special Judge in Payne County that handled small claims matters, who had orally denied that request. Contrary to the situation in *Hooper*, petitioners here have not previously submitted any part of this matter to a lower court and been denied relief.

**6.** Another dissenting opinion in this case appears to be of the view that we err in not granting original jurisdiction in that we leave the parties, "to run the gauntlet of meaningless litigation" in district court because in any appeal brought in this Court raising the same legal issues, a *de novo* standard of review will be applied. The fact is numerous appeals involve a *de novo* standard of review—e.g. motions to dismiss for failure to

state a claim upon which relief can be granted and most, if not all, situations where the appellate issues concern review of pure legal determinations of a district court. Thus, if such reasoning was followed, scores of litigants in other situations could make an argument they should be allowed to bypass the orderly process of proceeding first in district court and then on appeal to this Court from any adverse decision. However, as we recognized in *Jarman v. Mason*, 102 Okla. 278, 229 P. 459, 464 (1924), this Court is primarily an appellate court and arguments based on simple delay or expense will not normally be considered a viable rationale for us to exercise our discretion to assume original jurisdiction of a matter.

tection of taxpayers and citizens from illegal tax levies, would have been unable to function. Clearly, in *Mathews* a matter of such general importance was presented that the need for speedy resolution was evident.[7]

More recently, in *Ethics Commission v. Cullison*, 850 P.2d 1069 (Okla.1993), we assumed original jurisdiction, finding the matter involved an intolerable conflict between the Oklahoma Legislature and the constitutionally created Ethics Commission. In the case it was claimed that implementation of certain legislative enactments in the area of ethical conduct of governmental officials would effectively **destroy** the Commission, an entity that had only recently been charged by constitutional mandate with authority in this area. *Id.* at 1073. The dispute involved in *Ethics Commission* was one involving a conflict between co-ordinate branches of government amounting to governmental gridlock. *Id.* at 1073. Petitioners here claim no such intolerable conflict amounting to governmental gridlock that requires early resolution by this Court. As noted in *Ethics Commission*, only in **rare** circumstances should this Court assume original jurisdiction to grant a form of declaratory relief. *Id.* at 1072. We do not believe this is one of those rare cases.

A review of some other cases where this Court assumed jurisdiction evidences similar immediacy, urgency or need for a speedy resolution to decide a public law controversy that does not appear to be evident here. In *Wiseman v. Boren*, 545 P.2d 753 (Okla.1976), a writ of prohibition was sought to stop a former Governor and other officials from paying out of the State treasury over eighty million dollars ($80,000,000.00) in State funds to retire State general obligation bonds with-

out prior legislative appropriation. *Id.* at 755. The immediacy of the situation seemed obvious in that the former Governor had actually announced the funds were going to be so used and the monies had actually been transferred to a sinking fund for payment of the bonds. *Id.* at 755–756. In that the Legislature claimed entitlement to regularly appropriate the monies an urgent intolerable conflict existed calling for this Court's immediate attention. Another case where we assumed original jurisdiction involved the potential for impairment to the enforcement of the criminal laws of the State in certain counties because of a funding dispute over the payment of assistant district attorneys. *State ex rel. Blankenship v. Atoka County*, 456 P.2d 537, 538–539 (Okla.1969). Contrary to the situations in *Wiseman* and *Blankenship*, no urgency is involved here and, in fact, as noted, petitioners do not appear to claim any urgency calling for a speedy resolution.

In other recent cases, although the immediacy or urgency of the situation may not be directly discussed, when one thoroughly reviews them, the need for speedy resolution of the controversy is apparent. In *Hendrick v. Walters*, 865 P.2d 1232 (Okla.1993), a controversy was presented where a State Senator claimed that the then Governor had actually **forfeited** his office by failure to take a statutory oath. *Id.* at 1234–1235. We made it quite clear that the legitimacy of a myriad of legislative actions (e.g. confirming or refusing to confirm the Governor's appointees and overriding vetoes) were potentially cast into doubt by the claim that the Office of the Governor was vacant. *Id.* at 1238. Petitioners do not claim in this case that any of the offices involved in this

---

7. The need for early resolution was also discussed in *Williams Natural Gas Co. v. State Board of Equalization*, 891 P.2d 1219 (Okla. 1994), *cert. denied* — U.S. —, 116 S.Ct. 70, 133 L.Ed.2d 31 (1995), when we assumed original jurisdiction to decide whether ad valorem tax assessment of public service corporation property generally at a ratio higher than that used to assess railroad and airline property was unlawfully discriminatory. *Id.* at 1220–1221. The real potential for the unavailability of a sizeable percentage (6.8%) of ad valorem tax funds for schools, county government and/or other governmental entities was recognized and a possible revenue shortfall of over sixty million dollars ($60,000,000.00) was at issue. Although as one dissenting opinion points out, judicial economy was also noted to support our decision to grant original jurisdiction in the case because there were pending in the Court of Tax Review seventy (70) to ninety (90) other similar challenges, judicial economy was noted in addition to the public importance of the issue(s), **as was the evident and expressed immediacy involved,** and there is no indication we would have assumed original jurisdiction based solely on the fact similar cases were pending in a lower tribunal.

case are actually vacant by reason of improper legislative appointment. As noted, petitioners tacitly admit that the legislative appointees are properly serving in, at least, a *de facto* status and apparently that they should remain so until some unspecified time in the future.

Further, petitioners' failure to claim any vacancy exists in the offices involved, coupled with their failure to claim the Governor presently has any inherent appointment authority to the offices by virtue of constitutional provision or otherwise, makes this case distinguishable from others in the nature of quo warranto where parties to a State office are locked in a battle over who is the proper incumbent of the office. *See e.g. McKye v. State Election Board of State of Oklahoma,* 890 P.2d 954 (Okla.1995) (State House of Representative seat involved); *Nesbitt v. Apple,* 891 P.2d 1235 (Okla.1995) (seat on Oklahoma Corporation Commission involved).[8]

The current situation is also distinguishable from other recent cases. In *Johnson v. Walters,* 819 P.2d 694 (Okla.1991), a writ of prohibition was requested by certain legislative leaders against various boards, agencies, commissions and officers to prevent implementation of all the general legislation provisions of two legislatively passed bills. *Id.* at 696. In *Campbell v. White,* 856 P.2d 255 (Okla.1993), four legislators sought a writ of prohibition against the Director of State Finance and the State Treasurer to prevent disbursement of funds. *Id.* at 275 (Summers, J., concurring in part and dissenting in part). The case involved the constitutionality of the fiscal year 1993 appropriation bills for numerous State governmental agencies. *Id.* at 256–257. In *Johnson* and *Campbell* the potential for disruptive effect on the continued workings of governmental entities and/or the ongoing fiscal affairs of State government were involved, something not claimed by petitioners to be involved in the instant matter—at least not in any direct or immediate way as far as we can determine.

Immediacy was also indicated in cases such as *State ex rel. York v. Turpen,* 681 P.2d 763 (Okla.1984), where at the time of that decision opinions of the Attorney General declaring a statute unconstitutional were considered binding upon State officials [*Id.* at 765] and the question involved whether the Legislature was required to conform its actions to an Attorney General opinion. *Id.* at 768 (Opala, J., concurring). The case also involved what was described as a "monumental sum of tax revenue and the actuarial stability of the Police & Firefighters' Retirement & Pension System[s]." *Id.* at 765. In essence, the question answered in *Turpen* was whether the Legislature could alter by statute the disability or retirement pensions of police officers and firefighters eligible to receive a pension prior to a certain date, without a showing of necessity to protect the actuarial soundness of the pension systems, in light of an Attorney General opinion deemed binding at the time that had essentially opined it could not. In that we finally held in *Turpen* that Attorney General opinions stating a statute is unconstitutional would no longer be considered binding—but instead advisory only [*Id.* at 767]—the fact an Attorney General opinion concerning the subject of the instant matter exists currently provides no basis upon which original jurisdiction need be assumed in this case, as it might have at the time *Turpen* was decided, for the obvious reason no claim is made here that any of the parties **must** conform their actions to it.

In the final analysis, petitioners in the present case rely on only part of the equation in requesting this Court to assume original jurisdiction in the present case. Their claim is based solely on the public nature of the question—certainly an important one—but they fail to make any showing there is any urgency or immediacy involved that would require a speedy determination of the controversy. In that this Court must keep in mind that its primary function is appellate in nature, in the absence of such a showing we are

---

**8.** *See also State ex rel. Stuart v. Rapp,* 632 P.2d 388 (Okla.1981) (original jurisdiction assumed in action brought by district attorney to oust a district judge); *State ex rel. Oklahoma Tax Commission v. Mourer,* 596 P.2d 882 (Okla.1979) (original nal jurisdiction assumed in quo warranto matter to settle title to office on County Board of Equalization—dispute between appointee of Oklahoma Tax Commission and County Commissioner appointee).

convinced there is no necessity for the assumption of original jurisdiction in this case.

**Accordingly, the application to assume original jurisdiction is denied.**

ALMA WILSON, C.J., and LAVENDER, HARGRAVE and OPALA, JJ., concur.

SIMMS, J., concurs specially.

KAUGER, V.C.J., and HODGES, SUMMERS and WATT, JJ., dissent.

OPALA, Justice, concurring.

I write separately to explain why I join in today's refusal to assume original jurisdiction over the governor's request for settlement of the constitutional issue tendered.[1]

Fundamental fairness in litigation process cannot be afforded except within a framework of orderly procedure.[2] No area of the law may lay claim to exemption from the range of orderly procedure's basic strictures.[3] *The sparing use of our original jurisdiction is necessitated by the fundamental law's mandate for a tripartite division of governmental powers.*[4] This court's original cognizance *should not* be available to settle *all* constitutional issues in dispute between the executive and legislative branches. If judicial power could indeed be harnessed by mere request from the legislative or the executive department, the judiciary would become but an appendage to those political branches and an active, day-to-day participant in the government's policymaking process. *Judicial institutions could not remain true to their constitutionally-mandated posture of absolute detachment and neutrality*[5] *if they were to become indirect policymakers,*

1. My view remains unchanged by one dissenter's reference to the governor's veto of HB 2982. This postfiling event cannot be treated as a legal impediment to today's disposition. The lawsuit at hand presses for a declaration of four statutes' invalidity. No legal relief is sought by anyone from the governor's veto of HB 2982. The legislature has neither filed a counterclaim nor elsewhere sought relief from the legal consequences of that veto. The HB 2982 controversy cannot be raised *sua sponte*. The teachings of *State ex rel. York v. Turpen*, Okl., 681 P.2d 763, 768 (1984), will not support a plea for assumption of jurisdiction here. In *York* we pronounced an Attorney General's opinion not to be a constitutional barrier to legislative freedom of action. The justiciability requirement was viewed as met because there the AG's opinion affected a large sum of tax revenue and the potential actuarial stability of the police and firefighters' pension system. No similar crisis confronts the antagonists here. Granting relief based on the postfiling event—the HB 2982 veto—would be indeed beyond the issues tendered for our resolution in this case and hence *coram non judice*. *Goldman v. Goldman*, Okl., 883 P.2d 164, 166 (1994); *Estate of Flowers v. Clinkingbeard*, Okl., 848 P.2d 1146, 1155 (1993).

2. "* * * It is procedure that spells much of the difference between rule by law and rule by whim or caprice. Steadfast adherence to strict procedural safeguards is our main assurance that there will be equal justice under law. * * *" (Emphasis supplied.) *Joint Anti–Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 179, 71 S.Ct. 624, 652, 95 L.Ed. 817 (1951) (Douglas, J., concurring).

3. Chaos, caprice and *ad hoc* pronouncements would inevitably follow the slightest departure from orderly procedure. *Rodgers v. Higgins,* Okl., 871 P.2d 398, 414 (1993); *Snyder v. Smith Welding & Fabrication*, Okl., 746 P.2d 168, 171 (1986); *Pryse Monument Co. v. District Court of Kay County*, Okl., 595 P.2d 435, 438 (1979). *See also Handy v. City of Lawton*, Okl., 835 P.2d 870, 880 (1992) (Opala, C.J., dissenting in part).

4. While the U.S. Constitution does not explicitly mandate a tripartite division of government (*see I.N.S. v. Chadha*, 462 U.S. 919, 962–963, 103 S.Ct. 2764, 2790, 77 L.Ed.2d 317 (1983) (Powell, J., concurring)), our fundamental law, Art. 4, § 1, Okl. Const., expressly and inflexibly commands that the functions of government be divided into three departments. *Sterling Refining Co. v. Walker*, 165 Okl. 45, 25 P.2d 312, 320 (1933). The terms of Art. 4, § 1, Okl. Const., are:

"The powers of the government of the State of Oklahoma shall be divided into three separate departments: The Legislative, Executive, and Judicial; and except as provided in this Constitution, the Legislative, Executive, and Judicial departments of government shall be separate and distinct, and *neither shall exercise the powers properly belonging to either of the others.*" (Emphasis added.)

5. Our fundamental law explicitly prohibits a judge from exercising functions incompatible with (or not germane to) the Bench's constitutionally articulated mission and with the mandated posture of detachment and neutrality. *Earl v. Tulsa County Dist. Court*, Okl., 606 P.2d 545, 547 (1980); *Sterling, supra* note 4 at 320. *See also Galloway v. Truesdell*, 83 Nev. 13, 422 P.2d 237 (1967); *Opinion of the Justices*, 365 Mass. 639, 309 N.E.2d 476, 480 (1974); *Case of Supervisors of Election*, 114 Mass. 247, 249, 251 (1873).

*functioning at the beck and call of the government's political organs.*

The affairs of State must be managed solely by the legislative and executive departments—the political organs for policymaking.[6] As a *nonpolitical dispute-settling service*, the judiciary has no role in fashioning governmental policy. Respect for our scheme of tripartite distribution of powers demands that the judiciary be free from a *litigant-commanded intrusion* into the official relationship between the legislative and executive policymakers.[7]

Although Oklahoma's legal system is not bound by the restraints of the federal case-or-controversy requirement,[8] our law's *justiciability* concept imposes an equally rigid fetter.[9] Judicial cognizance cannot be invoked by a non-justiciable controversy—one that presents nothing more than an academic or abstract issue.[10] Two complementary, though somewhat different limitations, are

implicated in the state-law concept of judicial restraint. The *first* of these limits the business of courts to questions presented in an adversary context and in a form historically viewed as fit for resolution through the judicial process, and the *second* defines the role assigned to the judiciary in a tripartite allocation of power *to assure that courts will not invade areas committed to the other branches of government.*[11] *Justiciability* is therefore the term of art employed to give expression to this *dual limitation* placed upon the courts' powers of judicature.[12] *The barriers of justiciability prevent judges from roving outside the judicial role and giving voice to abstract grievances.* Courts are not *roving commissions* assigned to pass judgment on the validity of the State's laws. Constitutional judgments are justified only out of the *strict necessity* generated in particular cases in which rights between the litigants brought before the court *must be* adjudicated.[13]

6. *See Democratic Party of Oklahoma v. Estep*, Okl., 652 P.2d 271, 278 (1982) (the formulation of policy is a legislature's primary responsibility, entrusted to it by the electorate).

7. *Oklahoma Industries Authority v. Barnes*, Okl., 769 P.2d 115, 119 (1988).

8. Standing is an integral part of the mechanism for invoking the federal judiciary's power. *Toxic Waste Impact Group, Inc. v. Leavitt*, Okl., 890 P.2d 906, 914 (1994) (Opala, J., concurring). In the federal legal system standing is imbued with a constitutional/jurisdictional dimension, while in the body of state law it fits under the rubric of ordinary procedure. *Id.* at 914. The U.S. Constitution, Art. III, has long been held to require that a "case" or "controversy" is essential to invoke federal judicial jurisdiction and that a person's competence to bring an action is a core component of standing in a case-or-controversy inquiry. *Id.* at 914; *see* C.A. WRIGHT, LAW OF FEDERAL COURTS § 13, at 59–74 (4th ed. 1983). *See also* Part I of *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 558–59, 112 S.Ct. 2130, 2135, 119 L.Ed.2d 351 (1994).

9. To be appropriate for judicial inquiry, a controversy *must be justiciable.* Included within the *rubric of justiciability* is a controversy which (a) is definite and concrete, (b) concerns legal relations among parties with adverse interests, and (c) is real and substantial so as to be capable of a decision granting or denying specific relief. *Hendrick v. Walters*, Okl., 865 P.2d 1232, 1238 (1993); *Application of State ex rel. Dept. of Transp.*, Okl., 646 P.2d 605, 609 (1982); *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300

U.S. 227, 240–242, 57 S.Ct. 461, 464–465, 81 L.Ed. 617 (1937); *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 324–325, 56 S.Ct. 466, 472–473, 80 L.Ed. 688 (1936); *Hatfield v. King*, 184 U.S. 162, 165–166, 22 S.Ct. 477, 478, 46 L.Ed. 481 (1902). For a discussion of the *justiciability doctrine* in the federal judicial system, see WRIGHT, MILLER & COOPER, 13 FED.PRAC. & PROC.: JURIS.2d § 3529 (1984).

10. *Hughey v. Grand River Dam Authority*, Okl., 897 P.2d 1138, 1143 (1995); *Northeast Okl. Elec. Cooperative v. Corporation Com'n*, Okl., 808 P.2d 680, 683 (1991); *Westinghouse Elec. v. Grand River Dam Auth.*, Okl., 720 P.2d 713, 718 (1986); *Traders Compress Co. v. Board of Review, Okl. Employment Security Commission*, 203 Okla. 564, 224 P.2d 268 (1950). See also *Application of Goodwin*, Okl., 597 P.2d 762, 765 n. 8 (1979).

11. WRIGHT, MILLER & COOPER, *supra* note 9, § 3529 at 281–282, § 3531.2 at 391. In § 3531.2 at 391, the authors note that "[i]t is important to define by these means the role assigned to the judiciary in a tripartite allocation of power, lest the courts interfere unwisely with other branches of government and *in the end diminish their own powers.*" (Emphasis added.)

12. *Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968); WRIGHT, MILLER & COOPER, *supra* note 9, § 3529 at 281.

13. *See Broadrick v. Oklahoma*, 413 U.S. 601, 610–611, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973); *In re Snyder*, 472 U.S. 634, 642–643, 105 S.Ct. 2874, 2880, 86 L.Ed.2d 504 (1985); *Brock-*

Mere *disagreement* over the constitutional principles that chart the boundaries of departmental powers is not enough to supply the critical element of justiciability.[14] Much more is required for this claim by the governor to secure declaratory relief.[15] Nothing will suffice short of *real action* that (a) makes a *clash* of antagonistic forces *imminent* and (b) threatens to impede or disrupt the operations of vital service-rendering organs of the government.[16]

By resisting an invitation that would draw the judiciary into an inter-branch dispute over policymaking and by re-asserting its detachment from a *purely* non-justiciable arena of marketplace combat for allocation of power to govern, the court today remains true to its constitutionally mandated mission of *political neutrality.*

SIMMS, Justice, concurring specially:

I concur in the Court's refusal to accept jurisdiction.

We do not have an actual case or controversy with justiciable issues before us. The parties are merely seeking an advisory opinion on an abstract question, and it has long been the rule that this Court does not give advisory opinions or answer hypothetical

questions. *See Shinn v. Oklahoma City,* 184 Okla. 236, 87 P.2d 136 (1939); *City of Shawnee v. Taylor,* 191 Okla. 687, 132 P.2d 950 (1943), and cases cited therein.

In addition, this action for declaratory judgment is not properly brought in this Court. Our Declaratory Judgment Act, 12 O.S.1991, § 1651, et seq., places the authority and power to entertain proceedings for declaratory judgments in *cases of actual controversy* in the *district courts.*

Finally, it should be remembered that the doctrine of *publici juris* is not a ground of jurisdiction in itself. It is merely one factor a court may consider in deciding whether to assume original jurisdiction when such jurisdiction already exists on proper grounds.

I have consistently set forth these and additional reasons expressing my conviction that this Court errs when it treats disagreements and disputes between public officers in different branches of government, without more, as lawsuits. *See* dissenting opinions in *Campbell v. White,* 856 P.2d 255, 278 (Okla. 1993); *Ethics Comm'n v. Cullison,* 850 P.2d 1069, 1086 (Okla.1993); *State ex rel. York v. Turpen,* 681 P.2d 763, 768 (Okla.1984); and, *Oklahoma Ass'n of Municipal Attorneys v. State,* 577 P.2d 1310, 1315 (Okla.1978).

ett v. Spokane Arcades, Inc., 472 U.S. 491, 501–502, 105 S.Ct. 2794, 2801, 86 L.Ed.2d 394 (1985); *Chadha, supra* note 4, 462 U.S. at 937, 103 S.Ct. at 2776; *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

**14.** "Justiciability" is defined in *Ethics Commission v. Cullison,* Okl., 850 P.2d 1069, 1083 n. 19 (1993) (Opala, J., concurring in result) as follows:

"A *justiciable* controversy is a *real and substantial cause which is appropriate for judicial determination,* rather than a dispute or difference of hypothetical, abstract or academic nature." (Emphasis in original).

*See also Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 239–241, 57 S.Ct. 461, 463–464, 81 L.Ed. 617 (1937); WRIGHT, MILLER & COOPER, *supra* note 9, § 3529 at 282–283 n. 14.

**15.** *Cullison, supra* note 14 at 1080 n. 2 (Opala, J., concurring in result) (declaratory relief is available under the rubric of original jurisdiction).

Claims for declaratory judgment are *not a new cause of action* but a statutorily introduced *remedial form,* largely unknown to the unwritten Anglo-American tradition, for adjudicating rights cognizable at law and in equity, which while not *then* "actionable", *stricto sensu,* may nonetheless be tendered in the context of a justiciable controversy *before actual harm had occurred.* When so analyzed, the governor's suit for declaratory relief does *not* ask that we fashion a *new* cause of action. *Aetna, supra* note 14, 300 U.S. at 240–241, 57 S.Ct. at 463–464; *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671–672, 70 S.Ct. 876, 879, 94 L.Ed. 1194 (1950); *Steffel v. Thompson,* 415 U.S. 452, 478, 94 S.Ct. 1209, 1225, 39 L.Ed.2d 505 (1974) (Rehnquist, J., concurring); WALTER H. ANDERSON, 1 ACTIONS FOR DECLARATORY JUDGMENTS §§ 1, 2 (at 1–11), 4 (at 20–23), § 190 (at 382–383) (2d ed. 1951).

**16.** *Aetna, supra* note 14, 300 U.S. at 239–241, 57 S.Ct. at 463–464; *Flast, supra* note 12, 392 U.S. at 95, 88 S.Ct. at 1950; *Cullison, supra* note 14 at 1083 n. 19 (Opala, J., concurring in result); WRIGHT, MILLER & COOPER, *supra* note 9, § 3529 at 281–283.

KAUGER, Vice Chief Justice, dissenting, with whom WATT, Justice, joins, and with whom SUMMERS, Justice, joins in part II:

## I.

## ASSUMPTION OF ORIGINAL JURISDICTION

Even if initially no actual justiciable controversy existed under the facts presented at oral argument on April 10th, 1996—one does now. Since oral argument, the Governor, on April 29, 1996, vetoed House Bill 2982 and, on May 7, 1996, vetoed Senate Bill 876.[1] The Governor's veto message on House Bill 2982 stated:

"TO THE HONORABLE SPEAKER OF THE HOUSE AND MEMBERS OF THE HOUSE OF REPRESENTATIVES ... This is to advise you that on this date, pursuant to the authority vested in me by Section 11 of Article VI of the Oklahoma Constitution to approve or object to legislation presented to me, I have VETOED House Bill 2982. This Bill fails to address the problem of the violation of Section I of Article IV, of the Oklahoma Constitution. The current law provides for a majority of legislative appointments to an executive board which performs administrative duties. This bill does not correct that constitutional infirmity."

The Governor's veto message on Senate Bill 876 was identical to that of House Bill 2982.

We are now squarely presented with a real and lively controversy which clearly meets the justiciability requirements.[2] While the parties may not have been in gridlock on April 10, 1996, the cause now presents a substantial controversy and one which is, in addition, unequivocally *publici juris*. Okla. Const. art. 7, § 4 provides in pertinent part:

"The original jurisdiction of the Supreme Court shall extend to a general superintending control over all inferior courts and all Agencies, Commissions and Boards created by law ..."

We must exercise our constitutional duty and assume original jurisdiction and address the merits of this cause. The adoption of the majority opinion would force the parties to manufacture another case in controversy to submit to the district court.

This Court sparingly exercises its superintending power to assume original jurisdiction

---

**1.** This Court may take judicial notice of House Bill 2982 and Senate Bill 876 and the Governor's vetoes which are attached to the bills. Title 12 O.S.1991 § 2201 provides in pertinent part:

"... B. Judicial notice may be taken by the court of:
1. Private acts and resolutions of the Congress of the United States and of the Legislature of this state, and duly enacted ordinances and duly published regulations of governmental subdivisions or agencies of this state or the United States ..."

*Teague v. Scurlock*, 223 Ark. 271, 265 S.W.2d 528, 530 (1954) (Recognizing that the courts will take judicial notice of a bill and a governor's veto which is part of the record of the Legislature.). It is interesting to note that the concurring opinion objects to the Court's notice of the Governor's veto in House Bill 2982. Evidently, that has not been a problem before. In the mortgage debt case, *Willis v. Nowata Land & Cattle Co.*, 789 P.2d 1282, 1286 (Okla.1989), this Court took judicial notice of a policy **which was not in the appellate record.** The opinion speculated:

"The **standard mortgage clause,** on the other hand, operated to create an independent contract between the insurer and the mortgage lender so as to protect the latter from the borrower's misconduct and to shield the lender's own interest in the property. **This clause is similar in effect to the general indemnity principles; both treat insurance proceeds as replacement for the destroyed property, rather than as payment toward mortgage debt's satisfaction. Because the policy itself was not included in this appellate record, we must assume the insurance contract provisions in force when fire occurred contained the standard mortgage clause."** (Emphasis in original.) (Citations omitted.)

In *Willis,* this Court not only took judicial notice of a standard mortgage clause not in the record, it went much further and surmised that the clause was a standard one. Here, the Court refuses to notice the veto of a legislative enactment—a matter of public law—which clearly applies to the facts presented. When the matter involves the welfare of the public at large, this Court has not hesitated to *sua sponte* address a public law issue which is dispositive of a cause. See e.g., *First Federal Sav. & Loan v. Nath,* 839 P.2d 1336, 1339 (Okla.1992); *Burdick v. Indep. School Dist. No. 52,* 702 P.2d 48, 54 (Okla.1985).

**2.** See, *State ex rel York v. Turpen,* 681 P.2d 763, 768 (Okla.1984) (Opala, J., concurring). See also, *Application of State ex rel. Dept. of Transp.,* 646 P.2d 605, 609 (Okla.1982).

to address issues which are *publici juris.* In the last 50 years we have assumed original jurisdiction on the basis of *publici juris* only 44 times—less than once a year.[3] The common thread which is woven through the fabric of these opinions is the recognition that when some unusual situation is created in which a refusal to exercise jurisdiction would create a great wrong, result in a denial of justice or in the waste of judicial resources, this Court will exercise original jurisdiction.[4] This dispute is clearly *publici juris* because the sovereignty of the state, the franchises or prerogatives of the state, and liberties of its people are affected. The interest of the state is primary, not incidental, because these boards and commissions exercise powers which affect every citizen.[5] This conflict[6] between two powers of State government and their constitutionally vested authority[7] also involves an issue of public concern not only because it affects the elected officials who are directly involved, but because it also involves the delicate balance of powers between the legislative and executive branches of government.[8]

**3.** See, *Nesbitt v. Apple,* 891 P.2d 1235, 1238–39 (Okla.1995); *Sharp v. Tulsa County Election Bd.,* 890 P.2d 836, 839 (Okla.1994); *Williams Natural Gas Co. v. State Bd. of Equalization,* 891 P.2d 1219, 1221 (Okla.1994); *Campbell v. White,* 856 P.2d 255, 257 (Okla.1993); *Ethics Comm'n v. Cullison,* 850 P.2d 1069, 1072 (Okla.1993); *Movants to Quash Grand Jury Subpoenas Issued in Multicounty Grand Jury Case No. CJ–92–4110 Before Dist. Court of Oklahoma County v. Powers,* 839 P.2d 655 (Okla.1992); *Naylor v. Petuskey,* 834 P.2d 439, 440 (Okla.1992); *Johnson v. Walters,* 819 P.2d 694, 696 (Okla.1991); *Golden v. Okfuskee County Election Bd.,* 723 P.2d 982 (Okla.1986); *Davis v. Thompson,* 721 P.2d 789, 790 (Okla.1986); *DeLafleur v. Indep. School Dist. No. 11 of Tulsa County,* 727 P.2d 1352, 1353 (Okla.1986); *Stone v. Johnson,* 690 P.2d 459, 461 (Okla.1984); *State ex rel. York v. Turpen,* 681 P.2d 763, 764 (Okla.1984); *State ex rel. Cartwright v. Ogden,* 657 P.2d 142, 143 (Okla.1982); *State ex rel. Poulos v. State Bd. of Equalization,* 646 P.2d 1269, 1270 (Okla.1982); *Application of State ex rel. Dept. of Transp.,* 646 P.2d 605, 609 (Okla.1982); *State ex rel. Stuart v. Rapp,* 632 P.2d 388, 389 (Okla.1981); *Smith ex rel. State v. State Bd. of Equalization,* 630 P.2d 1264, 1265 (Okla. 1981); *Draper v. State,* 621 P.2d 1142, 1145 (Okla.1980); *State ex rel. Howard v. Oklahoma Corp. Comm'n,* 614 P.2d 45, 51 (Okla.1980); *State ex rel. Oklahoma Tax Comm'n v. Daxon,* 607 P.2d 683, 685 (Okla.1980); *State ex rel. Cartwright v. Dunbar,* 618 P.2d 900, 903 (Okla.1980); *Russell v. Henderson,* 603 P.2d 1132, 1134 (Okla. 1979); *State ex rel. Oklahoma Tax Comm'n v. Mourer,* 596 P.2d 882, 884 (Okla.1979); *State ex rel. Wiseman v. Oklahoma Bd. of Corrections,* 614 P.2d 551, 552 (Okla.1978); *Oklahoma Ass'n of Municipal Attorneys v. State,* 577 P.2d 1310, 1312 (Okla.1978); *Phillips v. Oklahoma Tax Comm'n,* 577 P.2d 1278, 1280 (Okla.1978); *State ex rel. Grand Jury of McCurtain County v. Pate,* 572 P.2d 226, 227 (Okla.1977); *Sanders v. Followell,* 567 P.2d 84, 86 (Okla.1977); *Halstead v. McHendry,* 566 P.2d 134, 136 (Okla.1977); *In re Application of Bd. of Ed. of Western Heights Indep. School Dist. No. 41,* 565 P.2d 677, 679 (Okla.1977); *Matter of Suntide Inn Motel, Oklahoma City,* 563 P.2d 125, 127 (Okla.1977), overruled on other grounds by *Indep. School Dist. No. 89 of Oklahoma County v. City of Oklahoma City,* 722 P.2d 1212, 1216 (Okla.1986); *Application of Grand River Dam Authority,* 554 P.2d 5, 7 (Okla.1976); *Wiseman v. Boren,* 545 P.2d 753, 755 (Okla. 1976); *Pan Am. Petroleum Corp. v. Bd. of Tax–Roll Corrections of Tulsa County,* 510 P.2d 680, 682 (Okla.1973); *Barton v. Derryberry,* 500 P.2d 281 (Okla.1972); *Oklahoma Farm Bureau v. State Bd. of Ed.,* 444 P.2d 182, 183 (Okla.1968); *Hoover Equipment Co. v. Board of Tax Roll Corrections of Adair County,* 436 P.2d 645, 646 (Okla. 1967); *State ex rel. Nesbitt v. Ford,* 434 P.2d 934 (Okla.1967); *Sublett v. City of Tulsa,* 405 P.2d 185, 189 (Okla.1965); *Allen v. Burkhart,* 377 P.2d 821, 823 (Okla.1962); *Welch v. Key,* 365 P.2d 154, 156 (Okla.1961); *State ex rel. Bd. of Education of City of Sapulpa v. State Bd. of Education,* 197 Okla. 324, 170 P.2d 540, 541 (Okla. 1946); *Wells v. Childers,* 196 Okla. 353, 165 P.2d 371, 374 (Okla.1945).

**4.** See, *Sharp v. Tulsa County Election Bd.,* see note 3, supra; See also, *State ex rel. Cartwright v. Ogden,* note 3, supra; and *State ex rel. Poulos v. State Bd. of Equalization,* note 3, supra, which recognize that where the matter is *publici juris* we assume original jurisdiction and proceed to consider the case on the merits.

**5.** *State ex rel. Peterson v. Olson,* 307 N.W.2d 528, 530 (N.D.1981); *State ex rel. Link v. Olson,* 286 N.W.2d 262, 266 (N.D.1979).

**6.** The petitioner is the Chief Executive Officer of the State of Oklahoma who appears in his representative capacity to seek relief from this Court. The Governor's position is that this legislation impedes his freedom of appointment power. Clearly, the petitioner has standing to prosecute this action. See, *State ex rel. York v. Turpen,* note 2, supra, (Opala, J. concurring).

**7.** *Ethics Comm'n v. Cullison,* see note 3, supra; *Nesbitt v. Apple,* see note 3, supra (Issues arising out of dispute as to the lawful holder of office of state corporation commissioner were *publici juris.*).

**8.** Okla. Const. art. 5, § 60 provides:

"The Legislature shall provide by law for the establishment and maintenance of an efficient

In *Ethics Comm'n v. Cullison,* 850 P.2d 1069, 1072 (Okla.1993), we invoked original jurisdiction pursuant to the Okla. Const. art. 7, § 4 to address a dispute between two entities of State government—the Legislature and the Ethics Commission. Here, our choice is between assuming jurisdiction or allowing the parties to fashion litigation which would be initiated in district court but which would ultimately be resolved in this Court. An additional irony is imbedded in this second alternative because, insofar as these appointments are concerned, there are no disputed fact issues to be resolved. We are faced with a pure question of law. It is the responsibility and duty of the Supreme Court to act as the ultimate interpreter of the Constitution.

In the interest of judicial economy, in its role of superintending control of all boards and agencies, and in the interest of the public, this Court has consistently addressed issues of great public concern. For example, in *Southwestern Bell Tel. v. Okla. Corp. Comm'n,* 873 P.2d 1001, 1009–10 (Okla.1994), *cert. denied* —— U.S. ——, 115 S.Ct. 191, 130 L.Ed.2d 123 (1994), we addressed the question of whether there is a right to an unbiased decisionmaker in ratemaking proceedings when the proceedings are legislative in nature. However, "[i]n an attempt to conserve judicial resources, as well as the resources of the rate payers," the Court, after deciding the case in controversy, rendered authoritative advice on the right to an unbiased decision maker in adjudicative proceedings as well. In *Williams Natural Gas Co. v. State Bd. of Equalization,* 891 P.2d 1219, 1221 (Okla.1994), we were presented with questions concerning whether the State Board of Equalization could assess differing tax ratios among various public service corporations from that assessed for railroads and airlines. We recognized that, in addition to the public importance of the issues, judicial economy would be served by resolving the *publici juris* issues and by assuming original jurisdiction to address the merits of the cause.

This Court exercises its superintending power infrequently to assume original jurisdiction to dispose of a cause [9] which is *publici juris.* However, in other cases we zealously guard basic fundamental rights concerning access to the courts even in cases which appear facially to be frivolous. For example, we assumed original jurisdiction in *Hooper v. The Honorable Lois L. Belden,* No. 79,998, in which a plaintiff who had filed a pauper's affidavit in order to press a small claims suit concerning a squabble over allegedly erroneous toppings on a $7 pizza. The court clerk accepted the plaintiff's papers, but before filing them, hand-carried them to the trial court to review the application to proceed *in forma pauperis.* After the judge denied the application, we issued a writ of mandamus directing the court clerk to accept and file the plaintiff's paperwork, and further directed the trial court to inquire into the pauper's affidavit as provided by 28 O.S.1991 § 152(C) because the underlying constitutional right was in jeopardy. When measured by that standard, surely the present controversy, which includes a substantial quarrel between two branches of government, coupled with matters of *publici juris,* is important enough that we assume original jurisdiction to exercise that power and address the merits.

system of checks and balances between the officers of the Executive Department, and all commissioners and superintendents, and boards of control of State institutions, and all other officers entrusted with the collection, receipt, custody, or disbursement of the revenue or moneys of the State whatsoever."
Okla. Const. art. 6, § 13 provides:
"The governor shall commission all officers not otherwise commissioned by law. All commissions shall run in the name and by the authority of the 'State of Oklahoma,' to be signed by the Governor, sealed with the Great Seal of the State of Oklahoma, and attested by the Secretary of State. When any office shall become vacant, he shall unless otherwise provided by law, appoint a person to fill such vacancy, who shall continue in office until a successor shall have been duly elected or appointed, and qualified according to law."

9. For example, in 1995, this Court assumed original jurisdiction in nearly one forth of the 270 original jurisdiction actions that were presented to the Court.

## II.

### THE METAMORPHOSIS FROM OKLAHOMA'S TERRITORIAL LAW TO STATE GOVERNMENT LIMITED THE GOVERNOR'S APPOINTMENT POWER.

It has been recognized since statehood that the Governor has a limited power of appointment. In interpreting the people's will as expressly written in the Constitution, consideration must be given to what was sought to be avoided by the people of this state.[10] What was unmistakably sought to be avoided by the Okla. Const. art. 6, § 13 was a concentration of power. Otherwise, the checks and balances secured by Okla. Const. art. 5, § 60 would be useless and meaningless.[11]

Oklahoma's territorial law gave the governor the power to make all appointments. Section 2 of Oklahoma's Organic Act, 26 Stat. 82 (1890) provides:

"That the executive power of the Territory of Oklahoma Shall be vested in a governor, who shall hold office for four years and until his successor shall be appointed and qualified, unless sooner removed by the president of the United States. The governor shall reside within said Territory; shall be commander-in-chief of the militia thereof; he may grant pardons for offenses against the laws of said Territory; and reprieves for offenses against the laws of the United States, until the decision of the president can be made known thereon; **he shall commission all officers who shall be appointed to office under the laws of said Territory, and shall take**

**care that the laws be faithfully executed.**" (Emphasis supplied.)

Nevertheless, when the people of Oklahoma formed a state government and adopted the Oklahoma Constitution, the appointment power created in the Governor was substantially reduced from that accorded by the territorial laws. Under the Constitution, the Governor's appointment power was restricted by the people of the State of Oklahoma.[12] The Oklahoma Constitution, art. 6, § 13 provides:

"The Governor **shall commission all officers not otherwise commissioned by law.** All commissions shall run in the name and by the authority of the 'State of Oklahoma,' be signed by the Governor, sealed with the Great Seal of the State of Oklahoma, and attested by the Secretary of State. When any office shall become vacant, he shall, unless otherwise provided by law, appoint a person to fill such vacancy, who shall continue in office until a successor shall have been duly elected or appointed, and qualified according to law." (Emphasis supplied.)

A commission grants the right to have and to discharge the duties of a certain office.[13] This term, both in its ordinary meaning and its legal sense, reflects a delegation of authority by which jurisdiction or power is conferred to others. It is a warrant of office which authorizes the delegatee to execute the duties of the office.[14] Historically, the Legislature has statutorily commissioned significant appointments to Boards and Commissions. Only seven years after statehood, in

10. *Capitol Steel & Iron Co. v. Fuller*, 206 Okla. 638, 245 P.2d 1134, 1138 (Okla.1952).

11. Okla. Const. art 5, § 60, see note 8, supra.

12. The mindset of the members of the Constitutional Convention is also revealed by the treatment of the Office of the Lieutenant Governor. Because of the apparent abuse of the power to appoint standing committees of the state senates by some Lieutenant Governors in other states, (especially in Missouri a few years before), the members of the Constitutional Convention also deprived the Lieutenant Governor of the privilege of appointing the standing committees of the Oklahoma State Senate. Albert H. Ellis, A History of the Constitutional Convention of the State

of Oklahoma, p. 137 (1923). The Okla. Const. art. 5, § 28 provides:

"The Senate shall, at the beginning of each regular session and at such other times as may be necessary, elect one of its members President pro tempore, who shall preside over its deliberations in the absence or place of the Lieutenant Governor; and the Senate shall provide for all its standing committees and, by a majority vote, elect members thereof."

13. *United States v. Planter*, 27 Fed.Cas. 544, 546 (1852).

14. *Dew v. Judges of Sweet Springs Dist. Ct.*, 3 Hen. & M. 1, 43, 3 Am.Dec. 639, 648, 13 Va. 1 (1808).

*Riley v. State ex rel. McDaniel*, 43 Okla. 65, 141 P. 264, 265 (Okla.1914), the Court held that the power to select officers of the state was not an exclusive function of either the executive, legislative or judicial branches. We noted that while the task of appointing officers generally falls upon the Governor, the power of appointment arises not from any inherent right vested in the Governor, but because there are a great many officers "not otherwise commissioned by law." The *Riley* Court recognized that the power of appointment was a shared function and that "the power resides in the people, and they alone are authorized to say by what instrumentality the power may be exercised." Clearly, the governor's appointment power was expressly limited by the metamorphosis from Oklahoma territorial law to state government.

The pursuit of greater appointment powers by Oklahoma governors is neither new nor novel—nor is the answer. We first answered the question posed here in 1914 in *Riley*, and we last answered it six years ago on June 19, 1990, in *In re Initiative Petition No. 344*, 797 P.2d 326, 327–330 (Okla.1990), when we rejected an initiative petition ballot title among other reasons because it failed sufficiently to advise the electorate of the total replacement of article 6 of the Oklahoma Constitution.

Some of the changes made by proposed petition No. 344: 1) allowed the governor to appoint a majority of all boards immediately upon taking office and to appoint the remaining members two years later; 2) removed the power of the Legislature to enact laws determining how vacancies of elected offices of the Executive Branch are filled; and 3) removed the Governor's duty to give each house a full report of each state office and commission. We said that:

> "The main thrust of Initiative Petition No. 344 is to repeal the existing article VI of the Oklahoma Constitution and replace it with a new article VI. Article VI is the article which defines the executive branch of government.... **It appears from the design of Initiative Petition No. 344 that the effect would be to increase the pow-er of the newly elected Governor from what the designers of the constitution intended.** The signatories on the Petition and the voters should be informed of this effect. There is nothing in the statement on the Petition or in the ballot title to so alert the reader. Failure to inform the signatories and voters is deceptive and misleading, and therefore the Petition is invalid." (Emphasis supplied.)

Shortly thereafter, the Attorney General issued Opinion 90–31 on September 4, 1990, which confined its discussion of gubernatorial appointment power and the legislative appointment of executive officers to art. 4, § 1 of the Oklahoma Constitution. However, the opinion ignored both the clear language of the Oklahoma Constitution and of our opinion in *In re Initiative Petition No. 344* which recognized that the Okla. Const. art. 6, § 13 was designed and intended by the people of Oklahoma to limit the appointment power of the Governor. Instead, the Attorney General's opinion relied on federal policy as well as that from other states regarding the separation of powers.

Apparently, the petitioners rely on Opinion 90–31. While the policies articulated in the opinion are well reasoned, they have no application to Oklahoma constitutional law. Article 4, § 1 of the Oklahoma Constitution addresses the general structure of government. Article 6, § 13 of the Oklahoma Constitution specifically addresses the power of the Governor to make appointments to state boards and commissions. It is well settled that specific provisions of the constitution govern over general provisions—art. 6, § 13 controls here. Even so, under *State ex rel. York v. Turpen*, 681 P.2d 763, 767 (Okla. 1984), the issuance of an opinion finding an act of the Legislature unconstitutional is an unwarranted encroachment upon the power of the Legislature and the unique duty of the courts. An opinion of the Attorney General declaring an act of the Legislature unconstitutional is advisory only and it is not binding upon state officials until determined to be so by a court of competent jurisdiction.[15]

---

15. *Aetna Cas. and Sur. Co. v. State Bd. for Property and Cas. Rates*, 637 P.2d 1251, 1254 (Okla. 1981); *Pan Am. Petroleum Corp. v. Bd. of Tax-Roll Corrections of Tulsa County*, 510 P.2d 680,

The philosophy of the framers of the Constitution has been consistently re-echoed by the people of this state. In 1988, the electorate in State Question 613 voted to make the Labor Commissioner an elected state official rather than permit the Commissioner to be appointed by the Governor. The people have also had two recent opportunities to allow appointment to boards and commissions by persons other than the Governor. In 1990, pursuant to State Question 627, the people created the Ethics Commission with appointees by the Governor, Chief Justice, President Pro Tempore of the Senate, Speaker of the House and Attorney General.[16] In 1992, the people approved State Question 649, the Oklahoma Building Bonds Commission, which provided that members be appointed by the Governor and leaders of the two houses.[17] If the people now wish to grant more power to the Governor, it must be done at the ballot box. The Court's inaction delays the political prerogatives of the people. **If there is no justiciable controversy here, there can be no justiciable controversy in district court. The majority's failure to resolve this problem will result in an advisory opinion in which we tell the litigants to create facts in order to pose another case in controversy so that we can decide the appeal sometime later on the question of law which we avoid today.**

## CONCLUSION

This Court should exercise original jurisdiction and address the merits of this cause because the cause presents a real and lively controversy which clearly meets the justiciability requirements.[18] Original jurisdiction of this Court extends to matters of general, public interest and this controversy is clearly of public concern.

The Governor's appointment power is expressly limited by Okla. Const. art. 6, § 13 which stands in stark contrast to the Governor's power under Oklahoma's territorial laws.[19] From statehood to this day, the people of the State of Oklahoma have reiterated their position that the Governor's appointment power is limited, and that governmental power must remain widely dispersed.

HODGES, Justice, dissenting.

Today this Court declines to address this real and substantial dispute between two contending departments of government over the appointment of members of boards and commissions. The majority holds that there is no urgency involved in this dispute and thus no need for a speedy resolution. The parties are left to pursue the matter in the district court and undoubtedly to again visit this Court on appeal for *de novo* review of the same legal issues based on the same undisputed facts. The parties are thus left to run the gauntlet of meaningless litigation. I must dissent.

Petitioners note that the issues presented go to "the fundamental structure of government in Oklahoma." Respondents believe that if Petitioners' requested relief is granted it will constitute "the greatest transfer of power in Oklahoma since the Constitutional Convention." The impact of this litigation will assuredly go beyond the boards and commissions named as Respondents to dozens of others whose membership is designated in part by some entity other than the Governor. No reasonable mind could dispute the public importance of the issues presented.

In determining whether a controversy is appropriate for the exercise of original jurisdiction, this Court has considered both the importance and urgency of resolving the dispute. The majority focuses on only one of these guiding principals. Urgency is but one factor militating towards the assumption of original jurisdiction. It is to be weighed alongside the importance of the issues involved. The majority has weighed urgency

---

681 (Okla.1973); *State ex rel. Nesbitt v. District Court of Mayes County,* 440 P.2d 700, 707 (Okla. 1967).

**16.** Okla. Const. art. 6, § 10.

**17.** Okla. Const. art. 10, § 43.

**18.** *State ex rel. York v. Turpen,* see note 2, supra, (Opala, J. concurring).

**19.** See, Okla. Organic Act, 26 Stat. 82 (1890) § 2.

so heavily in the equation that it ignores the tremendous importance of the issues.

It is difficult to imagine a controversy whose resolution is more important to the proper functioning of this state's government. The need for review is heightened by the fact the Legislature has not followed an Attorney General's opinion which determined that the challenged statutes are constitutionally infirm under a separation of powers analysis.

Original jurisdiction should be assumed rather than waiting to review the issues in the inevitable appeal. Addressing Petitioners' application would provide the most expeditious method of resolving the controversy. It would also result in less disruption of state government. This Court has not and should not wait for disputes to escalate into a crisis posture before resolving issues of vital public concern such as the ones presented in this dispute between two departments of government. Today's dispute left unresolved is indeed likely to escalate into tomorrow's constitutional crisis.

SUMMERS, Justice, dissenting, and joining KAUGER, Vice Chief Justice, in part.

The Court declines to assume original jurisdiction in this dispute because it has determined that no pressing need for a prompt resolution is present, and the litigants may thus contest the matter in District Court. I respectfully disagree. I would assume original jurisdiction and decide the matter.

First, the matter is clearly one of *publici juris,* as it affects the State at large. *State ex rel. Freeling v. Lyon,* 63 Okla. 285, 165 P. 419, 420 (1917). It is true that this is insufficient, by itself, for this Court to assume original jurisdiction and address the merits of a controversy. The fact that a controversy is *publici juris* is not an independent grant of jurisdiction to this Court. *See Wixson v. Green,* 521 P.2d 817, 818 (Okla.1974), (a controversy *publici juris* did not create an independent grant of jurisdiction to adjudicate a matter upon the merits where that jurisdiction was to be exercised by a different agency).

*Publici juris* is one reason weighing in favor of assuming jurisdiction where the Court otherwise possesses jurisdiction to adjudicate the matter. It is most often invoked as one reason for excusing noncompliance with the rule of first seeking relief in the District Court. For example, in *Board of Commissioners of Carter County v. Worten,* 128 Okla. 104, 261 P. 553, 554 (1927) this Court gave two reasons why the usual rule requiring the petitioners to seek relief in the District Court did not apply. First, we said, because of the public importance of the questions presented, and second, because no other court possessed superintending control over the lower courts.

Another is that the parties may have confused this Court's power to provide the appropriate remedy with whether a cause of action exists. Fashioning a remedy for a justiciable controversy is well within the historic nature of the judicial power conferred on this Court by Okla. Const. Art. 7 § 1. *Ethics Commission v. Cullison,* 850 P.2d 1069, 1073 (Okla.1993). Creating a cause of action casts this Court into a more activist role, and it is this role that the Governor asks us to fill today. See *Hill v. Graham,* 424 P.2d 35, 38 (Okla.1967) describing the creation of a cause of action as judicial legislation. *Cf. Karriman v. Orthopedic Clinic,* 488 P.2d 1250, 1251–1252 (Okla.1971), (court declined there to create a cause of action).

Justiciability in Oklahoma courts need not be identical to its federal counterpart. *Toxic Waste Impact Group, Inc. v. Leavitt,* 890 P.2d 906, 910 n. 7 (Okla.1994). However, the exercise of judicial power by this Court (justiciability) must be consistent with that "judicial power" vested in this Court by Okla. Const. Art. 7 § 1, and in accordance with the historically recognized definition of "judicial power" contemplated by the framers of our Constitution. See *Draper v. State,* 621 P.2d 1142, 1145 (Okla.1980), where we said that construction of our Constitution is to be in accord with the intent of the framers.

At the time our Constitution was adopted this Court exercised judicial power and provided original jurisdiction relief to "the party aggrieved." *Thompson v. State ex rel. Cooksey,* 25 Okla. 741, 108 P. 398, 399 (1910). At

law the aggrieved plaintiff must have had a direct and immediate legally cognizable interest, while equity allowed additional parties who possessed remote and future interests. 3 J. Story, *Commentaries on Equity Jurisprudence*, § 1981 (W.H. Lyon, 14th ed. 1918).

In our case today the Governor expressly disclaims the right to make any particular appointment. He states that some unnamed executive officials must make the appointments. In substance, his allegation is not that he as Governor is the aggrieved party, but that he and/or some unnamed executive officers are aggrieved. In an action seeking declaratory relief against the State the petitioner must be the party aggrieved and the controversy must be justiciable. *Ethics Commission v. Cullison*, 850 P.2d at 1073.

Challenging a public appointment was at one time redressable via the remedy of mandamus, and a member of the public possessed a cause of action to seek such relief. *Thompson v. State ex rel. Cooksey, supra.* In contemporary jurisprudence an action in the nature of *quo warranto* is used to challenge such an appointment. A *quo warranto* proceeding may be brought by the Attorney General or a District Attorney. 12 O.S.1991 § 1533. We have also recognized that rival appointees possess an interest sufficient to be adjudicated in a *quo warranto* proceeding. *Cox v. Dawson*, 911 P.2d 272 (Okla.1996); *Nesbitt v. Apple*, 891 P.2d 1235 (Okla.1995); *Abitbol v. Priore*, 797 P.2d 335 (Okla.1990). A member of the public, as such, does not possess an interest cognizable in quo warranto to challenge an appointment. *Jackson v. Freeman*, 905 P.2d 217, 219 (Okla.1995).

If the Governor made an executive appointment to fill one of the positions he thinks is unconstitutionally filled by a legislative appointee, then the Governor's appointee would possess an interest sufficient to put in issue in a *quo warranto* proceeding the constitutionality of the appointment process. *Cox v. Dawson, supra; Nesbitt v. Apple, supra; Abitbol v. Priore, supra.* What the Governor asks this Court to do is to create a cause of action to allow him, using the procedural vehicle of declaratory relief, to contest the title of the offices held by legislative appointees prior to his act of creating rival appointees.

It is certainly true that this Court may create a cause of action, and we have done so recognizing the changing conditions of society, the possibility for evolution of the common law, and the reasonable expectations of the aggrieved to redress within the framework of a traditional judicial action. *Williams v. Hook*, 804 P.2d 1131, 1137–1138 (Okla.1990), (loss of parental consortium); *Brigance v. Velvet Dove Restaurant, Inc.*, 725 P.2d 300, 302–304 (Okla.1986), (dram shop action); *McCormack v. Oklahoma Publishing Company*, 613 P.2d 737, 740 (Okla. 1980), (invasion of privacy).

What we have is a controversy between the Governor and the leadership of the Legislature, a dispute of great public concern at the very top of two branches of government. Were I writing for the Court I would recognize that the Governor, as the appointing power for many executive officers, has an interest in determining the scope of that power prior to making an appointment to an office which would result in rival claimants to that office, the other claimants being those advanced by the Legislature. I would thus create a legally cognizable interest possessed by the Governor, to be adjudicated within the context of declaratory relief in such circumstances. Having assumed original jurisdiction on that issue I would resolve the controversy as explained by Kauger, V.C.J., in her opinion, and I join that latter part of her opinion.